07-1830-cr
USA v. Capers

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2007
(Argued: July 11, 2008  Decided: December 1, 2010)
Docket No. 07-1830-cr

_____

UNITED STATES OF AMERICA,

*Appellant*,

*-v.-*

WILLIAM CAPERS,

*Defendant-Appellee.*

_____

BEFORE:     POOLER and HALL, *Circuit Judges*, TRAGER, *District Judge.*[*]

_____

The government appeals from an order entered in the United States District Court for the

Southern District of New York (McKenna, *J.*) to suppress inculpatory statements made by

defendant-appellee while in custody.  We AFFIRM the order of the district court on the ground

that the initial interrogation conducted by an investigator aware of the obvious need for a

---

[*] Judge David G. Trager of the United States District Court for the Eastern District of
New York, sitting by designation.

*Miranda* warning, followed 90 minutes later by a second, post-*Miranda* interrogation by the same investigator, on the same subject matter, under similar circumstances and with no explicit curative language amounted to a deliberate, two-step interrogation technique designed to undermine the defendant's *Miranda* rights.

Judge Trager dissents in a separate opinion.

———————————————

Anna E. Arreola, Assistant United States Attorney (Katherine Polk Failla, Assistant United States Attorney, *of counsel*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for Appellant*.

Jerrold L. Steigman (Cyrus R. Vance, Jr., *on the brief*), Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York, *for Defendant-Appellee*.

———————————————


HALL, *Circuit Judge*:

The government appeals from an order entered in the United States District Court for the Southern District of New York (McKenna, *J.*) to suppress inculpatory statements made by defendant-appellee while in custody. We AFFIRM the order of the district court on the ground that the initial interrogation conducted by an investigator aware of the obvious need for a *Miranda* warning, followed 90 minutes later by a second, post-*Miranda* interrogation by the same investigator, on the same subject matter, under similar circumstances and with no explicit curative language amounted to a deliberate, two-step interrogation technique designed to undermine the defendant's *Miranda* rights.

# BACKGROUND

In March 2005, the United States Postal Service suspected defendant-appellee William Capers, employed as a mail handler, of stealing money orders from Express Mail envelopes. Postal Inspectors decided to conduct a sting operation targeting Capers. In December 2005, Inspectors planted two Express Mail envelopes in the mail-sorting facility where Capers worked. One envelope contained $30 cash, and the other contained two $80 money orders and was equipped with an alarm device. The alarm was set to trigger automatically in the event the envelope with the money orders was opened and its contents removed.

Having planted the envelopes in a mail container, Postal Inspectors Hoti, Del Giudice, Moon, and Chow conducted surveillance of Capers throughout the day. At approximately 5 p.m., Capers noticed the envelopes for the first time. Approximately two hours later, Capers and Juan Lopez, a fellow employee, entered a trailer holding mail containers and briefly disappeared from the inspectors' view. Less than one minute later, the alarm in the envelope sounded, and the postal inspectors rushed into the trailer to apprehend both Capers and Lopez. The inspectors handcuffed both suspects. Inspector Hoti instructed Capers to follow him into a supervisor's office. Inspectors Del Guidice and Moon also entered the office. They instructed Capers to sit in a chair, still handcuffed, while the three inspectors stood around him. None of the inspectors gave Capers a *Miranda* warning.

According to the testimony of Del Giudice, Hoti said to Capers:

something like, look, you know, talk to me or don't talk to me, I don't care but I'm telling you right now or I'll tell you that I'm going to do my best to make you go away, and I just

want you to know. And I've been watching you all day. I know everything that you did tonight.

(Hr'g Tr. 95, Sept. 5, 2006.) Hoti then asked Capers where the contents of the Express Mail envelope were located. Capers gestured toward his right side pants pocket, and Hoti asked Capers what was in his pocket. Capers replied the money orders. (Hr'g Tr. 34.) Hoti asked for Capers' permission to "grab" them, and when Capers said "yes," Hoti removed the money orders from Capers' pocket. (Hr'g Tr. 34.) Hoti asked Capers if the money orders belonged to him, and Capers said no. (Hr'g Tr. 34.) Capers told Hoti that he got the money orders from the Express Mail envelope. (Hr'g Tr. 64.) Hoti also questioned Capers about the $30 cash that had been planted in the other Express Mail envelope, but Capers stated that he did not know anything about it. The entire questioning took less than five minutes. Regarding the lack of a *Miranda* warning, Hoti testified that he did not read Capers his rights because he was in a hurry to track down the missing money orders so that they did not get lost in the large mail-sorting facility and because he needed to question Lopez, who was held handcuffed outside the supervisor's office to determine his level of involvement in the crime.

Del Giudice and Moon then escorted Capers to a van to transport him to another Postal Service facility (the "Bronx Domicile") for further questioning. They waited in the van for approximately 15 to 20 minutes while the other inspectors located the alarm device from the opened envelope. In the van, Del Giudice engaged Capers in conversation primarily about Capers' automobile. Capers remained handcuffed throughout this time, which included 15 to 20 minutes of waiting and 20 minutes of driving to the Bronx Domicile.

When they arrived at the Bronx Domicile, the inspectors placed Capers in an interview room and handcuffed him to the chair in which he sat. Del Giudice and Moon remained with him, engaging him in further conversation, and gathering relevant personal information from Capers for their paperwork. At one point, Capers asked Del Giudice about the possibility of being fired, and Del Giudice told him that "it's in your best interest to tell the truth when Inspector Hoti comes down. Be honest. It's always better if you're honest." (Hr'g Tr. 117.)

Capers and the two postal inspectors waited for approximately 30 to 40 minutes until Hoti entered the room. Hoti then advised Capers of his *Miranda* rights. Hoti made no reference, however, to the statements Capers had already made during the initial interrogation. Hoti explained in his testimony, "I don't remember the specific question and its sequence, and I don't see a need to say what did you do with the contents of this Express Mail when I already have the answer to that. So I would not have asked that same question." (Hr'g Tr. 72.) Capers signed a Postal Service Warning and Waiver of Rights form, and Hoti proceeded to question Capers about the events of the evening, specifically asking about what he did with the Express Mail envelopes earlier that night. Capers verbally confessed to taking the money orders. When Hoti asked him to provide a written statement, Capers replied by asking, "What's in it for me?" (Hr'g Tr. 51.) Hoti told Capers "there's nothing I can promise you," and then ended the questioning. (Hr'g Tr. 51.)

Capers was indicted in March 2006, charged with one count of theft of mail matter by a postal employee, in violation of 18 U.S.C. § 1709. He moved to suppress the inculpatory statements he made both before and after receiving the *Miranda* warning, and on March 30, 2007, the district court entered an order suppressing the statements. The district court found that

5

"[t]he government has not shown that . . . defendant relinquished his right to remain silent voluntarily with a full awareness of the rights being waived and the consequences of doing so." *United States v. Capers*, No. 06 Cr. 266, 2007 WL 959300, at *15 (S.D.N.Y. Mar. 29, 2007) (internal quotation marks omitted). Although the district court found that the postal inspectors did not have the "specific intent" to circumvent Capers' *Miranda* rights, *id.*, it did find their interrogation tactics deprived Capers of a "genuine right to remain silent," *id.* at *14. The United States filed a timely notice of appeal.

## DISCUSSION

### I. Standard of Review

"We review a district court's determination regarding the constitutionality of a *Miranda* waiver *de novo*." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007). In doing so, we review "a district court's underlying factual findings for clear error." *Id.*

### II. *Miranda* and the Two-Step Interrogation Technique

The issue before us is whether Hoti and the other postal inspectors deliberately deprived Capers of the rights to which he is entitled under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government argues that the defendant was given an effective *Miranda* warning prior to making voluntary inculpatory statements, and therefore the statements he made following the warning should not have been suppressed by the district court. Capers argues that the rule that the Supreme Court announced in *Missouri v. Seibert*, 542 U.S. 600 (2004), and that this Court further clarified in *Carter,* requires us to conclude that the postal inspectors' two-step interrogation in this case constituted a deliberate violation of Capers' *Miranda* rights.

6

"The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *Carter*, 489 F.3d at 534. The Supreme Court, in *Oregon v. Elstad*, 470 U.S. 298 (1985), and *Seibert*, 542 U.S. 600, has twice addressed situations like this one in which a suspect in custody confessed without having received a *Miranda* warning, subsequently received a *Miranda* warning, and then confessed again.

*Elstad* involved a situation in which a suspect made a self-incriminating statement while two police officers were at his home investigating a robbery. At the time he had not received a *Miranda* warning. *Elstad*, 470 U.S. at 300-01. The officers transported the suspect to a police station where they gave him a *Miranda* warning prior to obtaining both an oral and written confession. *Id.* at 301. At trial, the defendant moved to suppress the postwarning confessions on the ground that the statements made at the police station only came about as a result of the first inadmissable statement made at his house. *Id.* at 302. The Supreme Court ultimately rejected the "fruit of the poisonous tree" argument, *see Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), and held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made," *Elstad*, 470 U.S. at 309. The Court reasoned that the police did not employ any coercive tactics to elicit either confession and that the defendant made his postwarning confession voluntarily. *Id.* at 316. The Court concluded that "the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case." *Id.* at 318.

7

Whereas *Elstad* involved a good-faith effort by the police to administer a proper *Miranda* warning, *Seibert* addressed the use of a two-step interrogation strategy designed to elicit a post-*Miranda* waiver and confession after the defendant had already confessed before he was given *Miranda* warnings. In *Seibert*, the police department had a policy of withholding *Miranda* warnings until an arrestee confessed and then reading the arrestee *Miranda* warnings and asking for a waiver prior to eliciting a second confession. *Seibert*, 542 U.S. at 609-10 (plurality opinion).[1] The police in *Seibert* employed this strategy when they arrested the defendant for setting a fire that killed a teenager. *Id.* at 604. After taking the defendant into custody and deliberately withholding *Miranda* warnings, the police elicited a confession. *Id.* at 604-05. The police then gave the defendant a 20-minute break after which they provided her *Miranda* warnings, obtained a signed waiver of rights, and tape-recorded a second confession. *Id.* at 605. A majority of the Court admonished against the use of this "question-first" technique and held that this strategy violated *Miranda*. *Id.* at 617; *id.* at 620-21 (Kennedy, *J.*, concurring).

The *Seibert* plurality concluded that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613 (plurality opinion). The plurality focused on whether the midstream *Miranda* warning was effective, and questioned whether "it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires

---

[1] The Supreme Court noted a police officer's testimony at trial that the two-step strategy was promoted by his department, as well as by a national police training organization and was corroborated by a manual from the Police Law Institute, which provided instruction on the technique. *Seibert*, 542 U.S. at 609-10 (plurality opinion).

. . . . [and] advise the suspect that he had a real choice about giving an admissible statement at that juncture." *Id.* at 611-12. Writing for the plurality, Justice Souter laid out five factors to be weighed when analyzing the effectiveness of the warning: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and second" interrogation, (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

The plurality voted to suppress the second confession because, unlike in *Elstad*, the unwarned interrogation was "systematic, exhaustive, and managed with psychological skill." *Id.* at 616. Applying the five factors, the plurality focused on the facts that both phases of questioning occurred while the suspect was clearly in custody; there was no advice given to the suspect that her first statement was inadmissible; the same police officer conducted both interrogations in the same location with only a 15 to 20 minute break between the two; and references to the earlier confession fostered an "impression that the further questioning was a mere continuation" of the first interrogation. *Id.* The plurality ultimately concluded that "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 617.

Justice Kennedy agreed with the plurality's conclusion that the postwarning statements should be suppressed, but he believed the plurality's test "cut too broadly," *id.* at 622 (Kennedy, *J.*, concurring), because it applied in instances of "both intentional and unintentional two-stage interrogations," *id.* at 621. Under Justice Kennedy's approach, the first question would be

whether law enforcement officers used a "deliberate two-step strategy" in "a calculated way to undermine the *Miranda* warning," *id.* at 622, and "to obscure both the practical and legal significance of the admonition when finally given," *id.* at 620. If the answer to that question were "no," then the suppression analysis would be governed by the voluntariness standard set forth in *Elstad*. *Id.* If the answer were "yes," however, the next question would be whether any curative measures were taken "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Justice Kennedy provided two examples of such curative measures: (1) "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning . . . [because] it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn"; and (2) "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* Reasoning that the police had used a deliberate two-step interrogation technique and that no curative steps had been taken, Justice Kennedy concluded that the postwarning statements were inadmissible. *Id.*

In *Carter*, this Court joined the Eleventh, Fifth, Ninth, Third, and Eighth Circuits in applying Justice Kennedy's approach in *Seibert*, holding that "*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." *Carter*, 489 F.3d at 535. *Cf. United States v. Street,* 472 F.3d 1298, 1312 (11th Cir. 2006); *United States v. Courtney,* 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Williams,* 435 F.3d 1148, 1157 (9th Cir. 2006); *United States v. Kiam,* 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Hernandez,* 384 F.3d 562, 566 (8th Cir. 2004). *But see United States v. Heron*, 564 F.3d 879, 884-85 (7th Cir. 2009) (Justice Kennedy's concurrence is

10

not controlling). In *Carter*, law enforcement agents recovered a large bag of drugs after searching a restaurant owned and operated by the suspect. *Id.* at 531. Approximately 30 minutes after the search concluded, an agent noticed the suspect sitting outside the restaurant and, in a casual fashion, asked him about a brown substance found in the bag of drugs. The agent asked if the substance was heroin, and the suspect replied, "No, it's bad." *Id.* at 532. The agent then asked, "Bad what?," to which the suspect replied, "Bad coke." *Id.* The agent later testified that he asked the suspect about the drugs solely "out of curiosity." *Id.* Approximately 30 minutes later, after the defendant was given a *Miranda* warning and after he signed a *Miranda* waiver form, a different agent conducted a formal interrogation and elicited a full confession. *Id.* at 533. The latter agent had no knowledge of the suspect's previous statement about the brown substance and did not learn about it until shortly before the trial commenced. *Id.* The defendant moved to suppress the second confession on the grounds that he did not knowingly and voluntarily waive his *Miranda* rights. *Id.* at 534.

Analyzing "[t]he factual differences between [Carter's] case and *Seibert*," *id.* at 536, we determined that the agents in *Carter* did not deliberately use a two-step interrogation strategy designed to circumvent *Miranda* for three reasons: (1) there was almost no overlap between the suspect's first statement and his subsequent confession; (2) different officers questioned the suspect at different locations (the first outside the store that was being searched and the second in an interrogation room), and the second officer was not aware of the suspect's previous inculpatory statement; and (3) "the postwarning questioning was not a continuation of the

11

prewarning question."[2]  *Id.* at 536.  Accordingly, applying *Elstad*, we determined that Carter's

postwarning statement was made knowingly and voluntarily, and it was properly admissible at

trial.  *Id.* at 536-37.

Here, in a decision that predated *Carter*, the district court found that Capers did not give

his post-*Miranda* warning statement "voluntarily with a full awareness of the rights being waived

and the consequences of doing so."  *Capers*, 2007 WL 959300, at *15 (internal quotation marks

omitted).  For that reason, it suppressed Capers' statement.  In so doing, the district court rejected

Justice Kennedy's approach in *Seibert*, explaining that Justice Kennedy's concurring opinion

"cannot reasonably be taken to be the law of the land," because it did not represent the majority

opinion of the Supreme Court.  *Id.* at *11 (internal quotation marks omitted).

In a footnote to its decision, the district court remarked that "if Justice Kennedy's *Seibert*

concurrence represented the law, suppression would be denied."  *Capers*, 2007 WL 959300, at

*15 n.17.  The district court based this statement, which under the circumstances constituted

dictum, on its understanding that Justice Kennedy's test turned on "the subjective intent of the

police," *id.* at *10, coupled with the district court's own determination that the inspectors in this

case did not have the "specific intent" to evade *Miranda*, *id.* at *12.

Our intervening decision in *Carter*, however, requires a different analysis.  Under *Carter*,

we must address whether the officers employed a "deliberate, two-step strategy, predicated upon

---

[2] Because we concluded that the *Seibert* approach was inapplicable in *Carter*, we did not
reach the issue of whether the police undertook any curative measures such that the suspect
"would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver."
*Seibert*, 542 U.S. at 622 (Kennedy, *J.*, concurring).

violating *Miranda* during an extended interview," *Seibert*, 542 U.S. at 621, and if so, whether "specific, curative steps," *id.*, were taken to obviate the violation that occurred.

## III. Deliberateness

In *Seibert*, because the record was clear that the interrogating officers intentionally and purposefully employed a technique in which they had been instructed, *id.* at 609-10, Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately. Wrestling with the problem we now address, the Ninth Circuit has stated:

> As an initial matter, we note that Justice Kennedy did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy. . . .
>
> For example, Justice Kennedy's opinion is silent as to what, if any presumptions apply or which party bears the burden of proving or disproving deliberateness.

*United States v. Williams*, 435 F.3d 1148, 1158 & n.11 (9th Cir. 2006).

In constructing a method to determine deliberateness, the Ninth Circuit in *Williams* looked to whether "objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Id.* at 1158. Following on the Ninth Circuit's guidance, the test articulated by the Eleventh Circuit to determine deliberateness relies upon "the totality of the circumstances including 'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements.'" *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) (quoting *Williams*, 435 F.3d at 1159). The Fifth Circuit's articulation of when deliberateness may be inferred also relies upon the totality of the circumstances surrounding the interrogations:

13

[T]here was nothing in the circumstances or the nature of the questioning to indicate that coercion or other improper tactics were used. All evidence suggests that Nunez was calm and cooperative, and the agents did not act with aggressiveness or hostility. The district court stated that "the defendant initially had done nothing more than voluntarily respond to questions as to his name, place of birth, and immigration status."

*United States v. Nunez-Sanchez*, 478 F.3d 663, 668-669 (5th Cir. 2007). [3]

In our Court's opinion in *Carter,* 489 F.3d at 528, without expressly stating that we were doing so, we similarly analyzed objective factors. In the context of the interrogation that took place there, we needed only to consider three factors to conclude that the interrogating officers did not deliberately employ a two-step interrogation procedure: (1) there was no overlap between the suspect's first and second statements; (2) different officers questioned the suspect at different locations, and the second officer was not aware of the suspect's previous inculpatory statement; and (3) "the postwarning questioning was not a continuation of the prewarning question[ing]." *Carter*, 489 F.3d at 536.

These considerations, while determinative of the analysis of deliberateness on the facts presented in *Carter*, are by no means the only factors to be considered when seeking to divine whether the officers' actions are sufficiently indicative of a deliberate circumvention of *Miranda* to require that a defendant's statements must be suppressed. We recognize the wisdom of Justice

---

[3] In an unpublished Order and Judgment the Tenth Circuit, while declining to endorse either Kennedy's concurrence or the *Seibert* plurality opinion as the holding of *Seibert,* explained in *United States v. Crisp,* No. 09-5063-cr, 2010 U.S. App. LEXIS 7077, at *19-21 (10th Cir. Apr. 5, 2010), that the defendant's argument that his pre-warning statement was the product of a deliberate two-step interrogation was unavailing because no coercion was evident in either the surrounding circumstances or the content of the questioning, the pre-arrest statement "occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use" of the defendant's female companion, and "the *pre-Miranda* statements also were unrelated to the *post-Miranda* statements regarding cocaine base."

Souter's observation that "the intent of the officer will rarely be as candidly admitted as it was" in *Seibert*, where the interrogating officer testified not only that he was trained to execute a two-step interrogation procedure but also implied that the tactic is taught nationwide. *Seibert*, 542 U.S. at 616 n.6. In light of the above, we join our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence. *Cf. Seibert,* 542 U.S. at 622 (Kennedy, concurring) ("[A] multifactor test that applies to every two-stage interrogation may serve to undermine th[e] clarity [of *Miranda*].").

Recognizing the inherent difficulty in proving deliberateness, and also conceding that "determining the officer's state of mind at the time of the interrogation can be difficult," we turn to the unsettled question of which party bears the burden of proving deliberateness or absence thereof. *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006). For the following reasons, we hold that the burden rests on the prosecution to disprove deliberateness.

"[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Accordingly, courts place upon the government the burden to prove that a defendant's confession was voluntary. *See, e.g., Colorado v. Connelly,* 479 U.S. 157, 168 (1986). The question of deliberateness, while distinct from voluntariness, will nonetheless be dispositive of a defendant's challenge to the voluntariness of a confession garnered from a two-step interrogation procedure. *See United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008). The Eighth Circuit, which also

15

places the burden on the government to disprove deliberateness, cautioned that while "the law generally frowns on requiring a party to prove a negative," the Supreme Court has consistently required the government to prove the admissibility of a confession against a criminal defendant, *Ollie,* 442 F.3d at 1143. *See also Brown v. Illinois,* 422 U.S. 590, 603-04 (1975) (requiring the government to show that a confession was not the fruit of an earlier illegal arrest); *Connelly,* 479 U.S. at 168 (requiring the government to show that defendant's *Miranda* waiver given during an alleged psychotic episode, was knowing and voluntary).

Indeed, the Supreme Court has "always set high standards of proof for the waiver of constitutional rights . . .." *Tague v. Louisiana,* 444 U.S. 469, 470 (1980). In *Tague*, the Court held: "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Id.* Guided by *Tague,* we are mindful that evidence of deliberateness or lack thereof is similarly in the hands of the government, and we are further persuaded that the party seeking to introduce the confession should remain responsible for showing that it was not obtained through a subterfuge.

With respect to the quantum of proof necessary, we are mindful that *Miranda* may impose a "heavy burden [upon] the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination," and that in order to satisfy that burden a "high standar[d] of proof" is applicable. *Berghuis v. Thompkins,* 2010 U.S. LEXIS 4379, *43-44 (June 1, 2010) (Sotomayor, *J.*, dissenting). Nonetheless, "[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a

16

preponderance of the evidence." *Connelly,* 479 U.S. at 168.  We apply the preponderance standard to *Miranda* challenges in recognition that *Miranda* is an exclusionary rule "aimed at deterring lawless conduct by police and prosecution," and that imposing a higher burden of proof would do little to mitigate prosecutorial overreaching while at the same time concealing troves of probative evidence from the eyes of the jury.  *Twomey*, 404 U.S. at 489.  For similar reasons, we hold that the government must meet its burden of disproving the deliberate use of a two-step interrogation technique by a preponderance of the evidence.

Looking to the totality of the circumstances in the case before us, the evidence proffered by the government to show that Capers was not the subject of a deliberate, two-step interrogation is outweighed by subjective and objective evidence to the contrary.  Hoti testified that he delayed issuing a *Miranda* warning because his "mindset was on, one . . . recovering evidence, . . . [a]s well as determining if the two of them or if — either both of them or only one of them had any role to play in committing the crime."  (Hr'g Tr. 65.)  Hoti testified that he was concerned about losing the money orders in the "very, very large"  facility because the money orders were about the size of a U.S. dollar and the defendants could "toss them, hide them . . . [and] [y]ou'd have a real, real tough time finding [them] in this large facility like that with all the packages and other types of mail."  (Hr'g Tr. 31-31.)  As to making a determination about defendant Lopez, Hoti testified that "[i]f I could determine fairly quickly that, in fact, he had no role to play in that crime, I need to take those cuffs off and basically cut him loose."  (Hr'g. Tr. 35.)  When asked whether he was in a position to read Capers his *Miranda* warnings before asking him about the money orders, Hoti replied "absolutely."  (Hr'g. Tr. 65.)

17

The district court concluded from this testimony that Hoti's purpose in delaying a *Miranda* warning was not to undermine Capers' Fifth Amendment rights, but rather "to prevent the loss or concealment of the currency and money orders that the Express Mail envelopes contained, and to ascertain whether Lopez was involved in the crime, so that he could be freed or not." *Id.* at *12 n.13 (citation omitted). Neither of these reasons, however, justifies delaying a *Miranda* warning once it is obvious that a suspect is in custody. There is no exception to *Miranda* that allows a delay in giving *Miranda* warnings in order to preserve evanescent evidence. Neither is there an exception to *Miranda* that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release. Indeed, we agree with the *Williams* Court in its observation that

> [o]nce a law enforcement officer has detained a suspect *and subjects him to interrogation* . . . there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason . . . is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness.

435 F.3d at 1159. The only legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public -- neither of which was an issue here. *See, e.g., United States v. Newton,* 369 F.3d 659, 677 (2d Cir. 2004) (recognizing this "narrow exception" to the *Miranda* rule).

Inexperience, while not a legitimate excuse for postponing a *Miranda* warning, nevertheless may save a confession from exclusion under *Seibert. See United States v. Naranjo,* 426 F.3d 221, 232 (3d Cir. 2005) (implying that an "inadvertent" *Miranda* omission, or a "rookie mistake," should not warrant *Seibert* scrutiny). In the case before us, however, sufficient subjective evidence was adduced to rule out the officers' inexperience as well as raise significant

18

doubts as to whether a mistake had been made.  The district court found it clear from Hoti's testimony and from his experience in law enforcement that his failure to Mirandize Capers was not an accident. The district court explained: "Inspector Hoti did not merely forget to give defendant *Miranda* warnings . . . Inspector Hoti had served as a New York City police officer for some three years, and as Inspector Del Giudice testified, postal inspectors are 'trained to provide *Miranda* when there is a custodial interrogation.'" *Capers,* 2007 WL 959300 at * 12.  Indeed, Hoti explicitly testified that he "absolutely" was in a position to inform Capers of his *Miranda* rights once Capers was confined to the supervisor's office.  (Hr'g Tr. 65.)  The arrest of Capers did not occur "out of the blue," as it might were Hoti driving to work and witnessed a crime in progress, or were he responding to a radio call reporting a crime in progress.  Capers' arrest was the culmination of a nine-month investigation into Capers' suspected criminal activity.  In surveiling Capers and determining when to give the order to his team to descend on Capers and Lopez, therefore, Hoti had time to think through what procedural steps he would need to take following arrest in order to build his case for prosecution.  Because, as the district court found, Hoti had sufficient experience to know that a *Miranda* warning was unquestionably necessary in connection with Capers' post-arrest interrogation, the corollary to that finding must also obtain. Hoti was experienced enough to know that in this case there was no valid reason to delay a *Miranda* warning until after questioning a suspect in custody.

The district court found that there was "no evidence . . . that Inspector Hoti had the specific intent to use the two-stage questioning technique" to undermine Capers' *Miranda* rights. *Capers,* 2007 WL 959300 at * 12.  The dissent endorses this finding, arguing that "there is nothing suspicious about the reasons put forth by Inspector Hoti."  Dissent at 39.  Considering

19

the totality of the circumstances, however, we find Inspector Hoti's proffered reasons for delaying the *Miranda* warning to lack not only legitimacy, but also credibility. Inspector Hoti explained that he delayed informing Capers of his *Miranda* rights because Hoti had to determine if Lopez was involved in the scheme, and if he was not, release him. If Capers had told Inspector Hoti during the initial interrogation that Lopez had nothing to do with the scheme, would Inspector Hoti, who had just witnessed the two men enter a storage container and the envelope alarms subsequently sound, then have released Lopez on his own recognizance? We consider such a conclusion dubious. With respect to Hoti's claim that he did not want to lose the money orders and cash in the large postal facility, this assertion is belied by the testimony of the arresting officers that Capers and Lopez were detained almost directly after the envelope alarm sounded and were found either still in the storage container, or in that immediate vicinity. In light of the above, as well as objective evidence discussed below, the district court's finding that there was "no evidence" of a deliberate, two-step interrogation tactic at work was clear error. *Capers,* 2007 WL 959300 at * 12.

The dissent asserts that the "test used by the majority to determine whether Inspector Hoti deliberately utilized a two-step interrogation technique effectively undermines the subjective test established by Justice Kennedy . . . because it ignores subjective evidence showing that the inspector did not deliberately utilize a two-step technique, and instead relies exclusively on the objective factors listed in the non-controlling *Seibert* plurality opinion." Dissent at 38. This conclusion misreads our analysis and conflates Justice Kennedy's test with that articulated by Justice Breyer in his concurring opinion in *Seibert*. 542 U.S. at 617 (Breyer, J., concurring) ("Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn

20

was in good faith.") (citations omitted). By contrast, our analysis considers the subjective evidence adduced at the suppression hearing in the context set forth by Justice Kennedy — as instructive but not automatically dispositive. Justice Kennedy's concurrence in *Seibert* does not advocate a test whereby a deliberate two-step interrogation will be found only when a law enforcement officer admits to executing such a strategy. Nor does this test envision blind, unquestioning reliance on the testimony of arresting and interrogating officers. To the contrary, because Justice Kennedy's test seeks to exclude only those statements that are the result of *deliberate* and *calculated* police strategies to undermine *Miranda,* a searching and penetrating inquiry of the officer's testimony and proffered reasons for delaying *Miranda* warning is therefore necessary to determine when these strategies are being employed.

The dissent asserts that the above consideration "gives absolutely no weight to the inspector's testimony that his reasons for not immediately advising Capers of his *Miranda* rights were to prevent the loss or concealment of the currency and money orders that the Express Mail envelope contained and to ascertain whether Lopez was involved in the crime." Dissent at 38. The dissent argues that Judge McKenna "witnessed Inspector Hoti's testimony and was therefore better able to assess his credibility." Dissent at 11. Although appellate courts do not have the opportunity to observe witness testimony and are, therefore, precluded from making credibility determinations, in light of the clear inconsistency between Inspector Hoti's stated reasons for delaying *Miranda* warnings and the objective and subjective evidence constituting the remainder of the record bearing on this point, it is clear the district court's determination "that there is no evidence . . . Inspector Hoti had the specific intent to use the two-stage questioning technique with the purpose of first obtaining unwarned incriminating statements in order, in a subsequent

21

warned interrogation, to obtain similar incriminating statements," *Capers*, 2007 WL 959300 at

*12, afforded blind and absolute weight to the testimony of the arresting officers and ignored all

the other relevant evidence which we here announce must also be considered. [4] If Justice

Kennedy's test is to have any meaning outside of the unique and never-again-to-be-repeated

circumstances of *Seibert*, the district court's unidimensional analysis cannot be determinative of

the outcome in this case.

Objective evidence also leads us to conclude that the Government has failed to meet its

burden of demonstrating that Capers was not subjected to a two-step interrogation. First, there is

considerable overlap between the statements elicited from the defendant during the first and

second interrogation. Hoti's initial interrogation of Capers resulted in a confession and "there

remained 'little, if anything, of incriminating potential left unsaid.'" *Capers*, 2007 WL 959300,

at *13 (quoting *Seibert*, 542 U.S. at 616) (plurality opinion). The circumstances surrounding the

two sessions of the interrogation, including the nature of the respective environs in which the

interrogation took place and the continuity of the cast of interrogating officers, was indicative of

a deliberate two-step interrogation. While the location of the interrogation sessions changed, the

---

[4] We note that in light of the district court's conclusion that "Justice Kennedy's concurrence . . . cannot reasonably be taken to be the 'law of the land,'" it likely did not avail itself of a number of opinions by our sister circuits, which have been instructive in our analysis, advising trial courts how to gauge deliberateness under Justice Kennedy's *Seibert* concurrence. *See Street,* 472 F.3d at 1312 (11th Cir. 2006); *Courtney,* 463 F.3d at 338 (5th Cir. 2006); *Williams,* 435 F.3d at 1157 (9th Cir. 2006); *Kiam,* 432 F.3d at 532 (3d Cir. 2006); *Hernandez,* 384 F.3d at 566 (8th Cir. 2004). Indeed it appears as though the district court thought that the Kennedy test required it to analyze only the statements of the offending officer, without reference to any other facts, possibly contradictory to the statements of the officer, that appeared on the record.

22

first taking place in a room at the post office and the second in the Domicile, the inquisitorial environment of the questioning was consistent.

Unlike in *Carter,* the initial conversation between Capers and Hoti was in no way casual. *See Nunez-Sanchez,* 478 F.3d at 663-69. It began with Hoti's opening statement to Capers that "I'm going to do my best to make you go away, and I just want you to know." (Hr'g Tr. 95.) Capers was handcuffed throughout the process. On the facts presented, the district court correctly concluded, and we agree, that Hoti's initial questioning was indeed a formal interrogation. *See Capers*, 2007 WL 959300, at *4 (concluding that Capers was in custody from the moment he was handcuffed).

Between the two phases of the interrogation, Hoti's fellow inspectors engaged Capers in "small talk," and advised him that it was in his interest to tell the truth when Hoti arrived. Capers continued to be handcuffed throughout the process. The second phase of the interrogation also opened with a hostile remark, namely Hoti's observation that Capers was "one of the most laziest employees I've ever seen." *Cf. Nunez-Sanchez,* 478 F.3d at 668-69 (finding that there was "no evidence of a deliberate attempt to employ a two-step strategy" because, *inter alia,* "the agents did not act with aggressiveness or hostility"). In combination with the *Miranda* warning, the inspectors clearly established that this second encounter was not a casual conversation. For the most, part there was also continuity in the officers present at both interrogations. During the first interrogation Hoti asked the questions, while Del Guidice and Moon were present in the room. The second interrogation, at the outset, involved the same three inspectors with Hoti again asking the questions and Del Giudice and Moon remaining silent.

23

Finally, the temporal proximity of the pre- and post-warning interrogations, along with the continuity of Caper's custody, reasonably leads to the conclusion that the latter was a continuation of the former. Only 90 minutes separated the two interrogation sessions. And while not carried out to the degree it was in *Seibert,* at least to some extent the latter session was "essentially a cross-examination using information gained during the first round of interrogation." *See Carter,* 489 F.3d at 536. Accordingly, the government has not produced sufficient objective evidence to meet its burden to dispel a conclusion that Hoti's conduct amounted to a deliberate "question first" interrogation tactic designed to undermine Capers' exercise of his *Miranda* rights. [5]

## IV. Curative Measures

Deliberateness having been established, we must next consider whether any curative measures intervened to restore the defendant's opportunity voluntarily to exercise his *Miranda* rights. *See Seibert*, 542 U.S. at 622 (Kennedy, *J.*, concurring) ("[P]ostwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."). As noted, Justice Kennedy provided two

---

[5] The dissent argues that under the test outlined above "in almost all cases where a pre-warning confession is suppressed due to a violation of the suspect's *Miranda* rights, a subsequent post-warning confession will also be suppressed because the interrogating officer will be unable to articulate a 'legitimate' reason for not advising the suspect of his or her *Miranda* rights prior to the initial interrogation." Dissent at 40. This conclusion also misreads our reasoning. To the contrary, there be will many occasions where the totality of the circumstances surrounding the two interrogations leads to the conclusion that a two-step interrogation was the product of a "rookie mistake," resulted from poor communication among investigating officers, or occurred when an experienced officer suffered a momentary lapse in judgment. What will require higher scrutiny are situations where, as here, an experienced officer conducts both interrogations, and the reasons proffered for not initially *Mirandizing* a suspect are not only questionable but also inherently lack credibility in light of the totality of the circumstances.

24

examples of potential curative measures: (1) "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," and (2) "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* Based on the facts before us, we cannot say that any such curative measure occurred such that it rendered effective the *Miranda* warnings given to Capers before the second interrogation.

As discussed, although approximately 90 minutes passed between the first and second interrogations, the two rounds of questioning bracketed one continual process. Del Giudice and Moon were with Capers throughout the 90 minutes, engaging in "small talk" and advising Capers to tell the truth. Despite the different locations of the interrogation sessions, both occurred while Capers remained in handcuffs and in settings that clearly established the authoritative nature of the questioning. There is little meaningful difference between the circumstances surrounding Capers' two interrogation sessions, and there was certainly no "substantial break" that would have restored his *Miranda* rights.

Moreover, despite Hoti's knowledge that Capers' first statement would be inadmissable in court, he never alerted Capers to that fact. *Capers*, 2007 WL 959300, at *14. Hoti continued his line of questioning without dispelling Capers' probable assumption that he had already incriminated himself based on his first confession. Hoti revealed as much in his testimony. When asked whether he posed some of the same questions at the Bronx Domicile as he had asked earlier in the supervisor's office, Hoti replied that he did not see the need to ask the same questions for which he already had answers. (Hr'g Tr. 72.) By the same token, Hoti did build on Capers' admission of theft in the original session by structuring the second interrogation session to elicit a play-by-play description of how Capers went about stealing the money orders. Capers

25

thus had no reason to know that his first broad confession could not be used against him when, only 90 minutes later while still in close custody, he actually "waived" his *Miranda* rights.[6] On these facts, there were no measures taken to cure the inspectors' use of the deliberate, two-step interrogation strategy. Because on the objective and subjective evidence we are left to conclude that the inspectors employed a strategy to circumvent the defendant's *Miranda* rights and because there were no curative measures to ensure that the defendant was not misled with regard to his rights prior to his second confession, Capers' waiver of his *Miranda* rights was invalid. The district court, therefore, properly suppressed his post-warning confession.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to suppress the defendant's post-*Miranda* statements.

---

[6] Consideration of whether or not curative measures were taken is an inquiry separate and apart from determining deliberateness. When analyzing deliberateness, however, courts may consider an experienced officer's failure to warn a suspect that an earlier admission, known to the interrogating officer, is inadmissible. Indeed such an omission on the part of the interrogating officer is probative of a "calculated" plan to subvert *Miranda*.

TRAGER, *District Judge*, dissenting:

I respectfully dissent. My colleagues claim to follow this Court's previous decision in *Carter v. United States*, 489 F.3d 528 (2d Cir. 2007), and by extension Justice Kennedy's concurring opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004) – both of which require the district court to determine an interrogating officer's subjective intent for failing to warn a suspect of his *Miranda* rights. But the novel test crafted by the majority, which examines whether the interrogating officer's reasons would be deemed "legitimate" under *Miranda* and its progeny, instead makes subjective evidence virtually irrelevant in nearly every two-step interrogation case. As such, the majority's decision undermines Justice Kennedy's controlling opinion in *Seibert* and replaces it with the objective "effectiveness" test proposed by the non-controlling *Seibert* plurality opinion.

A more faithful application of Justice Kennedy's *Seibert* concurrence requires a conclusion that Capers' post-warning statements are admissible based on the district court's factual finding – made after a thorough review of all of the evidence – that Inspector Hoti did not deliberately utilize a two-step interrogation technique. The majority improperly undertakes a de novo review of the district court's factual findings rather than reviewing them using the traditional "clearly erroneous" standard. The majority suggests that a de novo review is made necessary by its purported construction of a novel "totality of the circumstances" test for determining whether an interrogating officer purposefully utilized a two-step interrogation technique. But this new test is entirely consistent with the one used by the district court to find that Inspector Hoti did not deliberately use such a technique, and therefore provides no basis to review the district court's factual findings de novo.

27

Moreover, even if de novo review is appropriate in this case, I would still disagree with the majority's decision to suppress the post-warning confession because the government has met its burden of proving by a preponderance of the evidence that Inspector Hoti did not intend to utilize a two-step interrogation technique. To the extent that the majority finds that any of the district court's factual findings were clearly erroneous, the majority misapplies the clearly erroneous standard by making credibility determinations regarding witness testimony. Such credibility determinations, while never appropriate for an appellate court to make, are particularly inappropriate where, as here, there is nothing in Inspector Hoti's testimony that is either contradicted by the record evidence or inherently unbelievable.

Because a proper review of all the evidence (including the subjective evidence) establishes that Inspector Hoti did not deliberately utilize a two-step interrogation technique to circumvent *Miranda*, the voluntary statements made in response to the post-warning interrogation should not be suppressed.

## I

This case involves a suspect who made a self-incriminating statement in response to questions from an interrogating officer prior to being warned of his *Miranda* rights, and then later made additional self-incriminating statement after being warned of his *Miranda* rights. The Supreme Court has twice considered cases of this nature – first in *Oregon v. Elstad*, 470 U.S. 298 (1985), and again in *Missouri v. Seibert*, 542 U.S. 600 (2004).

In *Oregon v. Elstad*, two officers went to the home of Michael Elstad – an individual they suspected of robbing a neighbor's house – with a warrant for his arrest. While there, one of the

28

officers had a brief conversation with the suspect without warning him of his *Miranda* rights. 470 U.S. at 300-01. The officer apparently failed to issue the warnings because it was not clear to him whether the suspect was in custody at the time. *Id.* at 315. During the conversation, the officer asked the suspect whether he knew the individual whose house had been robbed, to which the suspect responded by making an incriminating statement. Following that statement, the suspect was arrested and transported to the station house. Approximately one hour later, the same two officers who had arrested the suspect at his home advised him of his *Miranda* rights, and then proceeded to take a full statement from him. *Id.* at 301-02.

The Supreme Court found that, although the initial unwarned statement was inadmissible, the later postwarning statement was admissible because it was voluntarily made. According to the Court, "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309.

The issue of pre- and post-warning confessions again came before the Supreme Court in *Missouri v. Seibert*. In that case, the Court was confronted with the intentional use of a two-step interrogation technique where officers in the Rolla, Missouri police department had been trained to "withhold[] *Miranda* warnings until after interrogating and drawing out a confession," *Seibert*, 542 U.S. at 609 (plurality opinion), in order to "get a confession the suspect would not make if he understood his rights at the outset," *id.* at 613. The Court produced several opinions, none of which garnered the support of a majority of the Justices. Writing for four Justices, Justice Souter found that the post-warning statements were inadmissible (even though they were voluntarily made within the meaning of *Elstad*) because "the question-first tactic effectively threatens to

29

thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose . . . ."  *Id.* at 617.

Justice Souter's plurality opinion sets forth an objective test from the perspective of the suspect being interrogated, whereby a court deciding the admissibility of post-warning statements that followed inadmissible pre-warning statements should determine "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  *Id.* at 611-612.  The plurality described "effectiveness" as "[whether] the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture" and "[whether] they reasonably convey that he could choose to stop talking even if he had talked earlier."  *Id.*  According to the plurality, a court should perform this inquiry in *all* cases where the admissibility of post-warning statements is challenged based on the lingering effects of an inadmissible pre-warning interrogation.  *Id.*  This test would be performed in addition to the *Elstad* inquiry into whether the statements were knowingly and voluntarily made.

The plurality then listed several objective factors that a court should consider when determining whether the warning could function effectively.  These factors included:  (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second, the continuity of police personnel and (4) the degree to which the interrogator's questions treated the second round as continuous with the first.  *Id.* at 615.

30

Justice Kennedy, writing separately in an opinion joined by Justice Breyer, agreed with the plurality that the post-warning statements should be suppressed, but suggested a different test for determining their admissibility. In contrast to the plurality's objective test, Justice Kennedy – focusing more on the conduct of law enforcement – proposed a "narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring). According to Justice Kennedy: "When an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621. If the court finds that the interrogator did not deliberately use a two-step strategy, then "the admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id.* at 622.

In reaching this conclusion, Justice Kennedy rejected the majority's purely objective test, which was to be applied in cases of both intentional and unintentional two-stage interrogations, as "cut[ting] too broadly." *Id.* at 621-22. Instead, Justice Kennedy felt that a court should only consider whether the *Miranda* warning was effective – or, in Justice Kennedy's words, whether "curative measures are taken before the postwarning statements are made" – in cases where the interrogator *intentionally* used the two-step technique. *Id.* at 622. In cases where the interrogator did not intentionally use a two-step technique to undermine *Miranda*, Justice Kennedy felt that the "effectiveness" test should not be applied. *Id.*

Despite the fragmented nature of the decisions in *Seibert*, both the Supreme Court's and this Court's precedents make clear that Justice Kennedy's concurring opinion controls. "When a

fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). In *Seibert*, Justice Kennedy's opinion, which provided the fifth vote for suppressing the self-incriminating statements made by the defendant, controls because it provides a narrower exception to *Elstad* than the test proposed by the plurality. Whereas the plurality suggested that all cases where a two-step interrogation took place should be reviewed for the objective effectiveness of the *Miranda* warning, Justice Kennedy's concurring opinion holds that such a review should only take place in cases where the interrogator intentionally used a two-step technique to circumvent *Miranda*. The tests suggested by the plurality and Justice Kennedy diverge in cases where the interrogator unintentionally performed a two-step interrogation. In those cases, Justice Kennedy's concurring opinion states that the *Elstad* inquiry into whether statements were "knowingly and voluntarily made" still controls, whereas the plurality opinion states that the newly-crafted "effectiveness" test should also be applied. Because the test stated in Justice Kennedy's concurring opinion applies the "effectiveness" inquiry – which was approved for use in at least some circumstances by a majority of the Court – to a narrower set of cases than the test stated in the plurality opinion, *Marks* dictates that it be considered the controlling opinion from *Seibert*.[1]

---

[1] The applicability of *Marks* to *Seibert* is unaffected by this Court's opinion in *United States v. Alcan Aluminum Corp.*, 315 F.3d 179 (2d Cir. 2003). That case found that *Marks* was inapplicable to the Supreme Court's splintered decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), because Justice Kennedy's concurrence was "not a logical subset" of the plurality's analysis. *Alcan Aluminum Corp.*, 315 F.3d at 189. In *Eastern Enterprise*s, a four-Justice plurality found that the Coal Industry Retiree Health Benefits Act ("Coal Act") violated the Takings Clause of the Fifth Amendment. 524 U.S. at 537-38 (plurality opinion). Justice

Even more importantly for our purposes, this Court has already held that Justice Kennedy's concurring opinion in *Seibert* is the controlling opinion. In *United States v. Carter*, 489 F.3d 528 (2d Cir. 2007), decided after the district court issued its decision in the case at bar, this Court stated: "We now join our sister circuits in holding that *Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." *Id.* at 536. Although the district court did not have the benefit of guidance from this Court when it considered the question of which opinion from *Seibert* controls, *Carter* has since definitively answered that question.

My colleagues do not dispute that, post-*Carter*, Justice Kennedy's concurring opinion in *Seibert* clearly controls in this circuit (as well as most other circuits that have decided the issue[2]). The majority writes: "Under *Carter*, we must address whether the officers employed a 'deliberate two-step strategy, predicated upon violating *Miranda* during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." Majority Op. at 12 (quoting *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring)).

---

Kennedy joined in the result reached by the plurality but rejected its Takings Clause analysis, finding instead that the Coal Act violated substantive due process. *Id.* at 539-50. Unlike in *Eastern Enterprises*, where the plurality opinion and the concurring opinion reached the same result on entirely separate grounds, the concurring opinion in *Seibert* adopted the same "effectiveness" test as the *Seibert* plurality, but held that the test should be applied to a narrower subset of cases than the plurality would have held.

[2] As the majority recognizes in its opinion, this view has been adopted by the Third, Fifth, Eighth, Ninth and Eleventh Circuits. Majority Op. at 10. *But see United States v. Heron*, 564 F.3d 879, 884-85 (7th Cir. 2009) (concluding that the *Marks* rule is inapplicable to *Seibert* because "Justice Kennedy's intent-based test was rejected by both the plurality decision and the dissent").

33

Having recognized that Justice Kennedy's concurring opinion in *Seibert* controls, this case should be easily resolved based entirely on the district court's factual findings. Instead, the majority goes astray by reviewing the district court's factual findings de novo,[3] incorrectly applying the applicable test on de novo review, and doing so in a way that undermines Justice Kennedy's controlling *Seibert* opinion.

In Judge McKenna's thorough and well-reasoned opinion below, he stated that "[t]here is no evidence . . . that Inspector Hoti had the specific intent to use the two-stage questioning technique with the purpose of first obtaining unwarned incriminating statements in order, in a subsequent warned interrogation, to obtain similar incriminating statements." *United States v. Capers*, No. 06-CR-266, 2007 WL 959300, at *12 (S.D.N.Y. Mar. 29, 2007). Based on his finding of a lack of intent, Judge McKenna concluded: "[I]f Justice Kennedy's *Seibert* concurrence represented the law, suppression would be denied." *Id.* at *15 n.17. Under the test established in Justice Kennedy's *Seibert* opinion, the above factual finding is sufficient to determine that suppression should be denied, as the district court rightly noted.

The district court's factual findings made at a suppression hearing should not be overturned unless they are found to be clearly erroneous. *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004). "The trial court is in a unique position to evaluate witnesses' credibility,"

---

[3] Although the majority does not explicitly state that it is applying a de novo standard of review to the district court's factual findings, its analysis clearly demonstrates that it is doing so. *See* Majority Op. at 17 ("Looking to the totality of the circumstances in the case before us, the evidence proffered by the government to show that Capers was not the subject of a deliberate, two-step interrogation is outweighed by subjective and objective evidence to the contrary."); *see also id.* at 22 ("Objective evidence also leads us to conclude that the Government has failed to meet its burden . . . .").

*United States v. Davis*, 967 F.2d 84, 86 (2d Cir. 1992), and is thereby better positioned than an appellate court to make the necessary factual findings.

In this case, the district court considered the testimony from the interrogating officer – Inspector Hoti – and determined that he testified credibly with regard to his reasons for not giving defendant *Miranda* warnings prior to questioning him at the Bronx DMU when he said:

> Again, the importance to me in understanding this facility, I did not want to lose any of the evidence, I did not want to lose any of the evidence in the case. Obviously the importance of it, to recover that evidence as quickly as I can. Secondly, I have another individual that's – yes, he's cuffed outside of the office, Mr. Lopez. If I could determine fairly quickly that, in fact, he had no role to play in that crime, I need to take those cuffs off and basically cut him loose.

*Capers*, 2007 WL 959300, at *3 (quoting Tr. 35). The district court found that this testimony supported a finding that Inspector Hoti did not deliberately utilize a two-step interrogation technique, *id.* at *12, and further determined that the objective evidence in no way contradicted his testimony, *id.* ("There is no evidence . . . that Inspector Hoti had the specific intent to use the two-stage questioning technique with the purpose of first obtaining unwarned incriminating statements in order, in a subsequent warned interrogation, to obtain similar incriminating statements."). Based on all of the available evidence, the district court found that Inspector Hoti did not deliberately utilize a two-step interrogation technique to circumvent *Miranda*.

Even my colleagues in the majority are unwilling to say that this factual finding is clearly erroneous.[4] If the majority had reviewed the district court's decision (including its ultimate

---

[4] Although the majority states that the "district court's [subsidiary] finding that there was 'no evidence' of a deliberate, two-step interrogation tactic at work was clear error," Majority Op. at 20, it notably does *not* find that the district court's ultimate factual finding that Inspector Hoti did not intend to use a two-step interrogation technique to circumvent *Miranda* was clear error. Instead, it reviews the evidence in the record de novo and finds that "the government has not

conclusion that Inspector Hoti did not intentionally utilize a two-step interrogation technique) using the proper "clearly erroneous" standard, then the outcome under Justice Kennedy's test from *Seibert* would have been clear – suppression would have been denied because the interrogator did not deliberately utilize a two-step interrogation technique to circumvent *Miranda*.

But instead of reviewing the district court's factual findings for clear error, the majority improperly chooses to review the court's factual findings de novo, replacing the district court's credibility determinations with its own and re-weighing the evidence based on information obtained entirely from the written record.

The majority justifies its reexamination of the district court's factual findings by claiming that it is "constructing a method to determine deliberateness," Majority Op. at 13, namely, establishing which party bears the burden of proving deliberateness, and what that burden is. But even accepting that the majority's opinion clarifies aspects of a test that were previously unsettled in this circuit, there is still no basis for ignoring the district court's thorough fact-finding on this issue because the test articulated by the majority is the exact same test that was applied by the district court.

The majority states: "[W]e join our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." Majority Op. at 14-15. It goes on to state:

produced sufficient objective evidence to meet its burden." *Id.* at 24; *see also supra* note 3.

36

"[W]e hold that the burden rests on the prosecution to disprove deliberateness," *id.* at 15, and that the burden is that of a preponderance of the evidence, *id.* at 16-17.

The test used by the district court to determine whether Inspector Hoti utilized a deliberate two-step interrogation technique to circumvent *Miranda* is entirely consistent with each of the above holdings by the majority. In its written opinion, the district court examined "the totality of the circumstances" in making its factual determination regarding deliberateness, considering both subjective and objective evidence that it found relevant to determining whether Inspector Hoti deliberately utilized a two-step interrogation technique. *Capers*, 2007 WL 959300, at *11.[5]

Although the district court does not explicitly state in its opinion which side bears the burden of proving deliberateness, there is no doubt that the district court required the government to prove deliberateness by a preponderance of the evidence. At oral argument in the district court, Judge McKenna asked the parties, "[A]m I correct in assuming that the general rule applies, and that is, since this is a motion to suppress statements, that the government has the burden of proof by a preponderance," (J.A. at 349), to which the attorney for the government responded, "That's correct, your Honor." (J.A. at 350).[6]

---

[5] Even though the district court found that the objective evidence did not support defendant's contention that Inspector Hoti deliberately used a two-step interrogation technique, it nonetheless considered all of the objective factors articulated by the *Seibert* plurality in reaching that conclusion. *See Capers*, 2007 WL 959300, at *13-15. Therefore, the majority's claim that the district court "ignored all the . . . relevant evidence" besides the testimony of the arresting officers, Majority Op. at 21, is clearly contradicted by the district court's written opinion.

[6] The district court also clearly applied this preponderance standard in its written opinion. As stated above, the district court found that none of the evidence in the record contradicted Inspector Hoti's testimony that he did not intend to use a two-step technique to circumvent *Miranda*. *See supra* at 34-35.

37

## II

Even if de novo review of the district court's factual determination regarding deliberateness were appropriate in this case, I would still be unable to agree with the majority's finding that Inspector Hoti deliberately utilized a two-step interrogation technique to circumvent *Miranda*.

The test used by the majority to determine whether Inspector Hoti deliberately utilized a two-step interrogation technique effectively undermines the subjective test established by Justice Kennedy in his concurring opinion in *Seibert* (and adopted by this Court in *Carter*) because it ignores subjective evidence showing that the inspector did not deliberately utilize a two-step technique, and instead relies exclusively on the objective factors listed in the non-controlling *Seibert* plurality opinion.[7] In reviewing the evidence of whether Inspector Hoti utilized a two-step interrogation technique, the majority gives absolutely no weight to the inspector's testimony that his reasons for not immediately advising Capers of his *Miranda* rights were to prevent the loss or concealment of the currency and money orders that the Express Mail envelope contained and to ascertain whether Lopez was involved in the crime so that he could be released if necessary. Majority Op. at 17-19; *see also Capers*, 2007 WL 959300, at \*12 & n.13 (citing Tr. 32 & 35).

---

[7] The majority claims that its "analysis considers the subjective evidence adduced at the suppression hearing . . . as instructive but not automatically dispositive," Majority Op. at 20, but finds that, in this case, Inspector Hoti's testimony may be disregarded because it lacks credibility, *id*. But even if the majority had found that Inspector Hoti's testimony was credible, the majority would still have refused to consider the testimony because it deems Inspector Hoti's stated reasons as being illegitimate. *Id.* at 17-18. Notwithstanding the majority's proclamations to the contrary, it is clear that the "legitimacy" test adopted by the majority would make subjective evidence irrelevant in almost every two-step interrogation inquiry. *See infra* at 39-41.

38

Despite the fact that Judge McKenna – who witnessed Inspector Hoti's testimony and was therefore better able to assess his credibility – found that the inspector's testimony was credible, the majority chooses to give it no weight whatsoever because, according to the majority, Hoti did not articulate a legitimate exception to *Miranda*. Notably, the majority states:

> Neither of these reasons [given by Inspector Hoti] justifies delaying a *Miranda* warning once it is obvious that a suspect is in custody. There is no exception to *Miranda* that allows a delay in giving *Miranda* warnings in order to preserve evanescent evidence. Neither is there an exception to *Miranda* that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release.

Majority Op. at 17-18.

Even assuming the majority is correct in finding that Inspector Hoti's testimony did not express "legitimate" reasons for not immediately advising Capers of his *Miranda* rights, that conclusion would be of little import to the inquiry at hand – whether he deliberately utilized a two-step interrogation technique. Under the test established in Justice Kennedy's concurring opinion in *Seibert*, the operative question is not whether Inspector Hoti had a *legitimate* reason for questioning Capers prior to warning him of his *Miranda* rights, but instead whether his reason for doing so was to deliberately utilize a two-step interrogation procedure with the intended purpose of undermining *Miranda*. In an opinion joined by retired Justice David Souter sitting by designation, the First Circuit recognized as much and held that an interrogation for the purposes of recovering evidence did not constitute a deliberate two-step strategy because the initial interrogation was "aimed primarily at securing the [stolen] weapon" that the police were searching for. *United States v. Jackson*, 608 F.3d 100, 104 (1st Cir. 2010) (Boudin, J.). In this light, there is nothing suspicious about the reasons put forth by Inspector Hoti for why he did not

39

advise Capers of his *Miranda* rights prior to interrogating him. Both reasons, under the circumstances, were quite credible.

By importing the tests establishing legitimate exceptions to *Miranda* into the factual test for whether an interrogating officer deliberately utilized a two-step technique, the majority completely undermines the subjective test that lies at the heart of Justice Kennedy's *Seibert* opinion. The *Elstad/Seibert* line of cases is only relevant when statements made in response to the initial questioning are excluded by *Miranda*. If district courts are now required to disregard subjective testimony about an interrogator's reasons for not warning a suspect of his *Miranda* rights whenever pre-warning statements would be excluded by *Miranda*, then courts considering two-step interrogations will be forced to disregard whatever subjective evidence may exist.[8]

Under the majority's test, in almost all cases where a pre-warning confession is suppressed due to a violation of the suspect's *Miranda* rights, a subsequent post-warning confession will also be suppressed because the interrogating officer will be unable to articulate a "legitimate" reason for not advising the suspect of his or her *Miranda* rights prior to the initial interrogation. Under this approach, there would almost never be an occasion when Justice Kennedy's approach would be applicable.[9]

---

[8] The majority suggests that subjective evidence may rarely exist in cases involving two-step interrogations. Majority Op. at 14-15 ("[I]n most instances the inquiry will rely heavily, if not entirely, upon objective evidence."). But even if that were so, the potential scarcity of subjective evidence provides no justification for ignoring relevant subjective evidence when it does exist.

[9] Although the majority's test could still find that a two-step technique was not intentionally used when the pre-warning interrogation was performed by a different officer than the post-warning interrogation, and the second officer was not aware of the initial interrogation, *see, e.g.*, *Carter*, 489 F.3d at 536, Justice Kennedy's concurring opinion makes clear that, even when the same officer performs both the pre- and post-warning interrogations, a court may find that the illegitimate pre-warning interrogation was not done for the purpose of utilizing a two-

The inevitability of this result is made clear when the majority states that "[t]he only legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public," Majority Op. at 18 (citing *United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004)), because this exception could never apply to two-step interrogation cases. The *Elstad/Seibert* inquiry only comes into play when pre-warning statements are excluded by *Miranda*. In cases where the public safety exception applies, even those pre-warning statements are admissible, making the entire *Elstad/Seibert* inquiry unnecessary. If the public safety exception were the only "legitimate" reason that an officer could give for failing to advise a suspect of his *Miranda* rights prior to interrogating him – and thus the only reason that would allow a court to consider the officer's testimony – then it would never be proper for courts to consider an interrogating officer's testimony in two-step interrogation cases. This would entirely undermine the subjective test established in Justice Kennedy's *Seibert* opinion.

Moreover, even if the legitimacy of an interrogating officer's actions were an appropriate consideration for determining whether the officer intentionally used a two-step technique to undermine *Miranda*, there is nothing illegitimate about the reasons put forth by Inspector Hoti. All of the evidence sought by Inspector Hoti is beyond the scope of the *Miranda* protection. Although Capers' pre-warning statements would not have been admissible against him in a

---

step technique to circumvent *Miranda*. *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring) ("[I]t would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning."). *Elstad* is an example of such a case – the pre-warning interrogation was performed by an officer who also participated in the post-warning confession. *See Elstad*, 470 U.S. at 301-02. Yet Justice Kennedy found that the Court's decision not to exclude the post-warning statements in *Elstad* "was correct in its reasoning and its result." *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring).

41

criminal proceeding, Inspector Hoti testified that he was not interrogating Capers in order to procure a confession. Instead, he was seeking physical evidence (the currency and money orders) and information about Capers' co-conspirator, Lopez. An interrogating officer's failure to advise a suspect of his *Miranda* rights does not require suppression of the physical fruits of the suspect's unwarned statements. *See United States v. Patane*, 542 U.S. 630 (2004) (holding that physical evidence obtained as a result of unwarned statements is not excluded by *Miranda*); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986) ("The *Miranda* presumption of coercion has not barred the use of unwarned, voluntary statements . . . to locate non-testimonial evidence . . . ."). And *Miranda*, which protects a suspect's Fifth Amendment right against self-incrimination, does not protect suspects from making statements that incriminate other individuals. As such, there was nothing per se illegitimate about asking Capers whether Lopez was involved in the criminal activity or attempting to determine the location of physical evidence.

### III

In addition to improperly finding that Inspector Hoti's proffered reasons for delaying the *Miranda* warning should not be considered because they lack legitimacy, the majority also finds that those reasons lack credibility when considered in light of the objective evidence. Majority Op. at 19-20. Although this finding appears to be entirely superfluous to the outcome of this appeal based on the majority's novel "legitimacy" test, *see supra* note 7, to the extent it is at all relevant to result the majority reaches, it is an improper application of the clearly erroneous standard.

42

While a district court's findings of fact may be overturned if this Court determines that they are clearly erroneous, this Court is not entitled to overturn a district court's assessment of the credibility of a witness – an assessment which is the "providence of the district court." *United States v. Maldonado-Rivera*, 922 F.2d 934, 972 (2d Cir. 1990); *cf. United States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980) ("[I]t is unlikely that a district judge would reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions . . . ."). Furthermore, "[w]here there are two permissible views of the evidence, the court's choice between them cannot be deemed clearly erroneous." *Maldonado-Rivera*, 922 F.2d at 972 (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)). These rules are not merely based on the belief that the district court is better positioned to make determinations of credibility (as well as more experienced at making such determinations), but also on prudential concerns that "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources." *Anderson*, 470 U.S. at 574-75.

The majority disregards the above limits on the role of an appellate court, choosing instead to reject the credibility determinations made by the district court that it considers "dubious." While such a review of the district court's credibility determinations in never appropriate, it is particularly problematic in this case where there is nothing in Inspector Hoti's testimony that is either contradicted by the record evidence or inherently unbelievable. As such, the reasons given by the majority are insufficient to satisfy the clearly erroneous standard, which

requires this Court to have a "firm conviction that a mistake has been committed." *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008).

With regard to Inspector Hoti's claim that he had to determine whether Lopez was involved in the scheme, and if he was not, release him, the majority states that it is dubious that Inspector Hoti would have simply released Lopez had Capers said that Lopez had nothing to do with the theft. Majority Op. at 19. But nothing in Inspector Hoti's testimony suggests that he would have taken Capers' statements at face value and released Lopez based *entirely* on those statements. Instead, Inspector Hoti's testimony demonstrates that he knew very little about Lopez when he took him into custody. Although Capers was a suspect prior to the day of his arrest, Inspector Hoti had never seen Lopez and knew nothing about him prior to that day. (J.A. 62-63.) And although Inspector Hoti certainly had probable cause to believe that Lopez was involved in the incident based on evidence acquired the day of the arrest, that evidence consisted entirely of a glance from Lopez towards the bulk mail carrier ("BMC") containing the Express Mail envelopes and Lopez's presence in the truck with Capers when the alarm went off. (J.A. 62, 64-65.) It would have been perfectly rational for Inspector Hoti to want to confirm his suspicion that Lopez was involved in the theft, especially if it was true that Inspector Hoti knew absolutely nothing about Lopez prior to observing him on the day of the incident.

With regard to Inspector Hoti's claim that he did not want to lose the money orders, the majority finds that this claim is "belied by the testimony of the arresting officers that Capers and Lopez were detained almost directly after the envelope alarm sounded and were found either still in the storage container, or in that immediate vicinity." Majority Op. at 20. But the majority fails to explain how those facts are sufficient to leave this Court with "the firm conviction" that

44

Inspector Hoti did not actually fear losing the money orders.[10] When the alarm went off, both Capers and Lopez were out of Inspector Hoti's line of sight, hidden behind a large BMC in the back of a mail transportation truck. (J.A. 64-65.) Inspector Hoti then had to slide down a ladder, exit the lookout where he had been observing Capers, and run around the building to the area where Capers and Lopez were loading the truck before he could apprehend Capers and Lopez. (J.A. 67.) After Inspectors Hoti and Chow handcuffed Capers and Lopez, the inspectors entered the back of the truck where they were able to find the Express Mail envelopes, but not the money orders. (J.A. 67-68.) At that point, Inspector Hoti took Capers to the supervisor's office so that he could ensure that Capers was not able to hide the money orders – which were both evidence and the equivalent of cash – somewhere in the facility. Given the circumstances, it would have been entirely rational for Inspector Hoti to segregate Capers in the supervisor's office and attempt to retrieve the money orders as soon as possible.[11]

Because Inspector Hoti's testimony is entirely plausible (and certainly not so implausible as to raise a "firm conviction that a mistake has been committed"), it was not clear error for the district court to find that the government met its burden of proving by a preponderance of the evidence that Inspector Hoti did not deliberately utilize a two-step interrogation technique to

---

[10] Even if Inspector Hoti's fear of losing the money orders was irrational, a finding that he did, in fact, hold that irrational belief would still be sufficient to show that he did not intend to utilize a two-step interrogation technique.

[11] It should be noted that Inspector Hoti could have retrieved the money orders simply by performing a search incident to arrest, and such a search would not have run afoul of any of Capers' constitutional rights. Nonetheless, this would not have resolved the issue of Lopez's involvement.

45

circumvent *Miranda*.  Accordingly, Capers' voluntary post-warning statements should not be

excluded, and the district court's decision to exclude the statements should be reversed.[12]

For the foregoing reasons, I respectfully dissent.

---

[12] Because Inspector Hoti did not deliberately utilize a two-step interrogation technique, it is unnecessary to decide whether "curative measures [were] taken before the postwarning statements [were] made." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).