**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ADRIAN REYES,
       *Petitioner-Appellant*,

       v.

GREG LEWIS, Warden,
       *Respondent-Appellee.*

No. 12-56650

D.C. No.
5:12-cv-00691-GAF-E

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
November 19, 2014—Pasadena, California

Filed August 14, 2015

Before: William A. Fletcher and Jay S. Bybee, Circuit
Judges, and James K. Singleton, Senior District Judge.[*]

Opinion by Judge W. Fletcher;
Concurrence by Judge Singleton

---

[*] The Honorable James K. Singleton, Senior District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel reversed the district court's denial of a habeas corpus petition alleging that petitioner's state-court conviction rested on a confession obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004).

The panel held that for the purpose of review under the Anti-Terrorism and Effective Death Penalty Act, Justice Kennedy's concurrence in *Seibert* constitutes "clearly established" Supreme Court law. Under this concurrence, a post-*Miranda*-warning statement must be suppressed if interrogating officers deliberately use the two-step interrogation technique that was used in *Seibert*, and if effective curative measures are not taken to ensure that the suspect genuinely understood the *Miranda* warnings. The two-step technique involves interrogating in successive, unwarned and warned phases.

The panel held that under the circumstances of this case—where police interrogated the fifteen-year-old petitioner over the course of two days; where on the first day at a police station they conducted a two-hour unwarned interrogation; where on the second day at a sheriff's station they obtained a confession during an unwarned interrogation following an unwarned polygraph test; and where they transported the petitioner back to the police station and obtained a

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

postwarning confession "clarifying" what he had stated at the sheriff's station—a *Siebert* analysis was clearly required.

The panel held that because the state court did not conduct such an analysis, its decision was contrary to clearly established federal law, as determined by the Supreme Court, and thus was owed no deference. The panel held that the district court clearly erred in finding that the law enforcement officers had not deliberately employed the two-step interrogation process. In addition, the officers did not take effective curative measures. The panel held, alternatively, in agreement with the concurrence, that the state court's conclusion that sufficient curative measures were taken was an unreasonable determination of the facts. The panel reversed and remanded with instructions to grant the writ unless the petitioner was tried within a reasonable time, not to exceed 180 days.

Concurring, District Judge Singleton wrote that a *Siebert* analysis includes two parts. First, the court asks whether the two-step interrogation procedure was chosen intentionally in order to render subsequent *Miranda* warnings ineffective. Second, the court asks if the two-step process, whether or not intentional, rendered the subsequent warnings ineffective. Judge Singleton wrote that the state court followed *Siebert* by applying the second part of the test and concluding that sufficient curative measures were taken. Reviewing the first part of the test de novo, because the state court did not address it, Judge Singleton agreed with the majority that the use of the two-step procedure was a conscious effort to undermine *Miranda*. Granting deference to the state court on the second part of the *Siebert* test, Judge Singleton wrote that the state court's finding was based on an unreasonable determination of the facts.

## COUNSEL

Elizabeth Armena Missakian (argued), San Diego, California, for Petitioner-Appellant.

Kevin Vienna (argued), David Delgado-Rucci, and Daniel Rodgers, Deputy Attorneys General, Julie L. Garland, Senior Assistant Attorney General, and Kamala D. Harris, Attorney General, San Diego, California, for Respondent-Appellee

## OPINION

W. FLETCHER, Circuit Judge:

Petitioner Adrian Reyes petitions for a writ of habeas corpus on the ground, *inter alia*, that his state-court conviction rested on a confession obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). For the reasons that follow, we reverse the district court and remand with instructions to grant the writ.

### I. Factual Background

On January 11, 2006, an armed person got out of a silver Toyota Camry and shot Derek Ochoa three times. The person may have yelled "Delhi" (the name of an Orange County gang). Ochoa died as a result of the shooting. He was a senior at La Sierra High School in Riverside County.

Riverside Police Department officers traced the Camry to the home of Andres Munoz, an older cousin of petitioner Adrian Reyes. The car was registered to another member of the Munoz family, Albert. Reyes had recently moved to

Riverside County from Orange County. He was a freshman at La Sierra. He was not quite two months past his fifteenth birthday.

The day before the shooting, Reyes had been walking home from school with a friend. A carload of gang members drove up and asked Reyes where he was from. Reyes answered "Delhi." One of the gang members punched Reyes in the eye. They then drove away, yelling "South Side Riverside 51-50."

Two days after the shooting, Riverside Police Department homicide detectives James Brandt and Rick Wheeler questioned Reyes at his aunt's home. Reyes had moved from his family's home to his aunt's home the day after his assault by the gang members. The detectives' questions related primarily to the assault. During the questioning, Reyes acknowledged that he had known Ochoa and that he knew Delhi was a "group in Santa Ana."

Nearly a month later, on February 9, sometime between 5:20 and 5:30 in the morning, a SWAT team of between fifteen and twenty officers executed a search warrant on Reyes's aunt's home. They handcuffed Reyes and searched the house. In Reyes's bedroom they discovered papers with "Delhi" written in large block letters. After the house was secured, Reyes was released from handcuffs and allowed to eat breakfast.

Brandt told Reyes that he was not under arrest, but that he wanted to ask him some questions at the station. Reyes acquiesced, and he was driven to the Riverside police station. Reyes was not accompanied to the station by any family member. At the station, Brandt and Wheeler together

questioned Reyes. At no point during their questioning on February 9 did they provide *Miranda* warnings.

Reyes was held at the station for some time before he was questioned. Wheeler began the interview by saying, "Thanks for being so dang patient man I appreciate you . . . [h]anging out for us 'cause it's been a long day, long day." Wheeler told Reyes that he could stop the interview at any time: "I just wanna make sure that you understand that if we get at some point in the interview that you're done talkin' . . . and you don't feel like answering any more questions or whatever, let me know, okay?"

Wheeler asked briefly about the assault the day before the shooting. He then asked about the shooting. He said that the search warrants had been executed and that they had talked "with all these different people." "[W]e got pictures, too, . . . and I've had more than one person say that's the car that the guy was in, okay? . . . I've got enough information that shows that you were there." (Wheeler's statement was false. The only witness who had made any type of identification had not identified Reyes.) According to the transcript, Wheeler was interrupted by the "sound of sniffing." Wheeler continued, "[T]here's no denying it. . . . [T]he truth is gonna come out and, and I already know what it is." Reyes denied that he was there. "I didn't go out that day you could ask my Mom, you would ask anybody in my home I didn't come out that day, I was sleeping." When Wheeler said that the police had spoken to his family already, Reyes said, "Don't you guys have a lie detector or something? I, I was in my house."

Brandt then took over the questioning. He challenged Reyes, saying that he had his phone records. "When your phone is being used basically six, seven, eight times an hour

every, you know, on an average every five minutes so you're not sleeping okay?" Brandt was interrupted by the "sound of sniffing." Brandt suggested a mitigating version of events: "There is a big difference between being in the car when this thing happens . . . and being the shooter and stuff. . . . So just tell us what happened, okay?" "We've done our homework, dude and . . . don't screw yourself and lie to us, seriously, tell us what happened."

Wheeler and Brandt pressed Reyes on the inconsistency between Reyes's statements and his phone records. Wheeler asked him about the papers found in his room with "Delhi written in big letters." Brandt said, "We work homicide, alright, we gonna do our homework, definitely, I'm telling you, we have the car, we have the gun, we have five guns total. . . ." (Brandt's statement was false. The Sheriff's Department had not recovered—indeed, never did recover—the gun used to shoot Ochoa.)

Wheeler and Brandt continued to press Reyes. Brandt said, "[T]here's another detective was out showing witnesses the picture . . . 'cause we had a picture of you." Wheeler immediately followed, "And we identified you as being in the car." (Wheeler's statement was false. Reyes had not been identified by anyone as having been in the car.) Brandt said, "I'm not trying to trick you and . . . I'm not making the stuff up that I'm telling you . . . . [S]o you know I'm not trying to trick you."

Brandt talked about Ochoa's family and their "right to understand what happened." Reyes responded, "I don't really want to say nothing no more . . . trying to cooperate here." (Elision in original.) Brandt replied, "You're not cooperating." Brandt was interrupted multiple times by the

"sound of sniffing." A moment later, Brandt said, "Tell me what happened." Reyes responded, "I don't know nothing man."

Reyes said, "Stop asking me questions." Brandt said, "No I'm not gonna stop asking you questions." Brandt was again interrupted by the "sound of sniffing."

Brandt said, "[A]re you willing to take a polygraph examination?" Reyes responded, "Yeah." Brandt elaborated, "About everything." Reyes responded, "I guess, man, I don't know nothing man." Reyes mentioned that he might need to have his parents there, but Brandt interrupted him, saying, "[W]e'll certainly arrange for all that stuff just seeing that you're willing to . . . do it."

A moment later, Reyes said, "You guys stop asking me . . . kinda questions." (Elision in original.) "Stop[] asking this kind of stuff man." Wheeler, who had begun the interview by telling Reyes that he could stop at any time, did not stop. He responded to Reyes, "The only rope that you got is me throwing it to you right now and telling you 'you gotta be clean' because you haven't been. This thing's gonna burn you down."

Wheeler persisted, interrupted frequently by the "sound of sniffing." Reyes continued to indicate that he did not want to talk. "I've got nothing to say man." Brandt took over the questioning: "Okay, so witnesses identifying you and other people in the car identifying you, . . . you're good with that? . . . You want us to go in there with this two-hour conversation of you just lying about where you were when your phone records show it's not the case and all that stuff,

you're comfortable with that." Reyes replied, "Stop asking me man. I don't know nothing."

Brandt terminated the interview, saying, "This time when I walk out I'm not gonna come back and give you another shot, okay? We're gonna, we'll, we'll go to the D.A.'s office and, and then later on to court with the case we have and, and I'm, I'm not worried about it, I'm not gonna lose." Wheeler added, "Oh ya, we're not gonna lose that case." Brandt said, "Last chance." Reyes responded, "I don't know nothing man."

The transcript of the February 9 interview does not indicate start and stop times, but it is apparent from Brandt's statement referring to "this two-hour conversation," quoted above, that the interview took about two hours. Brandt testified at Reyes's preliminary hearing that the interview had taken "forty minutes to an hour," but his testimony is inconsistent with what he himself said during the interview and with the length of the transcript. The interview was interrupted thirty-three times by the "sound of sniffing."

Reyes went to his mother's house to sleep that night. The next morning, Brandt and Michael Medici, another Riverside Police Department detective, picked up Reyes and took him to the San Bernardino County sheriff 's station for a polygraph test. There is no written consent by an adult to the polygraph test. Brandt testified at the preliminary hearing that Reyes's mother gave permission "on the phone," and the record contains a police report stating that she had given permission. No family member accompanied Reyes to the sheriff's station.

Robert Heard of the San Bernardino County Sheriff's Department administered the polygraph test. Before administering the test, Heard spoke with Reyes for a sustained period. He impressed on Reyes the fact that he was an experienced test administrator. He recounted that he had gone to "polygraph school" "9 years before you were born," and that he was high demand as a polygraph teacher. At no point did Heard provide *Miranda* warnings.

Reyes had difficulty filling out a form Heard gave him, not knowing his zip code or his height and weight. Reyes had even more difficulty with the written consent form. When he did not understand the terms "duress and coercion" and "immunity," Heard explained them in simpler language. Reyes had particular trouble understanding what was meant by the sentence, "I hereby release the County of San Bernardino, the Sheriff's Department and Examiner administering this examination from any and all claims resulting from, or arising out of, this examination. . . ." After Heard explained what "release . . . from any and all claims" meant, Reyes said, "Alright, so that, that means like that you guys won't, won't trick me . . . ." Heard corrected him, saying, "Well, no, this doesn't say I won't trick you." Heard then added, "[Y]ou have my word I won't trick you." Heard again explained what "release" meant, and said, "That's what it means." Reyes responded, "Like you haven't tricked me or something." Heard replied, "Exactly, exactly." Thus informed, Reyes signed the consent form.

After administering the test, Heard told Reyes, "You failed the test. I have no doubt that you were there when Derek was shot." (There is nothing in the record to indicate whether Reyes had in fact failed the test.) Heard pressed

Reyes to give details about what he had done.  Reyes asked, "[L]ike what's the truth gonna help?"  Heard answered:

> [T]hey read my report and the detectives, their supervisor reads the report. . . . And the District Attorney's gonna ask these detectives hey, how was Adrian?  Is he one of these, you know tough, gang banger type guys[]?  No, no.  Adrian's a nice young man.  He cooperated, failed the test, and without hesitation he says hey, look, man, I feel bad about what happened. . . . Adrian, I can't tell you what's gonna happen because you know what?  I don't know.  I don't[] know what's gonna happen because you haven't told me what happened out there. . . . [Y]ou tell me I'm going to state prison for, I, I, said 25 to life or something like that.  Fifteen year olds don't go to state prison, Adrian.

Reyes responded, "I know, but I've got a go to Juvenile Hall."  Heard replied, "Well, I don't know what's gonna happen because I, you haven't told me anything yet, Adrian."

Heard continued to ask Reyes what happened, and Reyes repeated several times that he did not know.  Heard asked from what side of the car the shooter had shot.  Reyes responded, "Oh, not that I know, you know, so don't ask any question."  Heard asked, "You wanna be alone?"  Reyes replied, "No, it's just, just don't ask any questions," and then said, "Can we just call the detectives?"

Brandt and Medici then came into the room and took over from Heard. At no point in the interview that followed did they provide *Miranda* warnings.

Brandt asked at the outset, "[W]hat's your biggest concern, going to jail?"

> Reyes: Think so.
>
> Brandt: At all or for a long time?
>
> Reyes: For a long time.
>
> Brandt: Okay, how long do you think you would go to jail for?
>
> Reyes: I don't know. Like it's a murder, probably like 25 years.
>
> Brandt: Yeah? How old are you?
>
> Reyes: 15.
>
> Brandt: How many 15 year olds do you know that go to jail for 25 years?
>
> Reyes: None.
>
> Brandt: Huh?
>
> Reyes: None.
>
> Brandt: Okay, so why would you be any different?

Reyes: I don't know.

Brandt then asked, "Remember yesterday I asked you . . . if Derek had anything in his hands or reached for his pockets, anything like that? You remember me asking you that?" Reyes replied, "No." Brandt then told Reyes that Ochoa had had a gun:

> There's a reason, a very easy explanation to this whole thing. . . . The deal is . . . Derek had a gun in his pocket. . . . Now, if he's going for a gun in his pocket or you believed he was going for a gun in his pocket and we find one, that's obviously, and it's, there's an explanation as to what happened. Maybe you just stopped and talked to him because you knew him, and then he's going for a gun or something like that . . . and shit happens.

(Third elision in original.) (Brandt's statement was false. Ochoa had not had a gun.)

Brandt went on, "If it's just . . . a cold blooded thing, no, we just, went up and . . . did it and, and shot him just because, um, and I don't feel bad about it . . . that looks bad." Reyes said, "It wasn't like that." Brandt said, "Tell me, tell me why, how did it happen then?" Reyes hesitated. "I'm scared, man. . . . Make everybody go to prison and everything, like I want everybody to get locked up." Brandt responded, "[I]f he's going for a gun, dude, . . . that's gotta be explained. We have to know that and we have to be able to tell the District Attorney's office that . . . ." Reyes still hesitated. After encouragement from Brandt, he finally said, "Um hmm, hmm, well, he, you, he always had a gun."

After more encouragement, Reyes said, "He was just running up to the car." Brandt asked, "Okay, was he reaching for his pockets or anything like that?" Reyes replied, "Yeah." Brandt said, "Okay, and what happened?" Reyes replied, "I don't know." Reyes expressed concern about his older cousin, Andres Munoz, and sought to exculpate him. "Well, if I say something like what's going to happen with my cousin? Is he still gonna go to jail? . . . He had nothing to do with it."

Brandt asked, "Did you shoot him because you thought he was going for a gun? Yeah? Did you . . . see the gun in his pocket?"

> Reyes: He was reaching for it.
>
> Brandt: Okay . . . and then what happened?
>
> Reyes: He had a grip on it.
>
> Brandt: Okay, do you remember . . . what pocket it was in, what side it was in? Okay, do you remember seeing the grip of the gun though? And he was reaching for it? But what was he yelling at you guys?
>
> Reyes: I don't know. It was just, I wasn't panicked . . . ain't gonna say nothing, just scared.
>
> Brandt: You were scared cause he was going for the gun? And then, and what happened?
>
> Reyes: I don't know. I just shot.

Reyes's statement that he had shot Ochoa came early in the interview, on the seventh page of the transcript. Brandt and Medici continued to question and talk to Reyes for another thirty-five pages. Much of the later exchange was friendly, even including a discussion of Christmas. Reyes said that his family opens presents at "twelve in the night." Brandt responded, "Oh, see I can't stay up that late," and Reyes laughed. Near the end of the interview, Medici asked, "Does your Mom know about any of this, your Dad?" Reyes responded, "It'll be cool like if you guys don't tell my Mom, you know, cause . . . [l]ike it'll break her heart and shit, you know, cause like she's very religious." Brandt told Reyes, "Oh, we don't need to run over there."

Immediately after the February 10 interview at the San Bernardino sheriff's station, Brandt drove Reyes back to the Riverside police station where he and Wheeler had interviewed him the day before. The length of the drive is not in the record, but it is apparent from a map of the area that it was no more than fifteen miles. When they arrived at the Riverside police station, Reyes was put in an interview room.

Brandt and Medici together questioned Reyes. Brandt began the interview:

> OK. Uuh, we talked to people at the D.A.'s office and stuff about the case. Kinda told them that, you know, you came clean and finally told us the truth and why things happened and, you know that you were, you know, obviously scared and all that kind of stuff. Uuh, there's more questions that they want answered, if we can. OK, just to, to clarify stuff. Alright, so I wanna talk to you

> again, but because you've been sitting in that room and the door was locked and you're not free to leave, I wanna read you your rights, OK? And then ask you some questions. OK? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning. Do you understand each of these rights that I've explained to you? Yeah? OK. Can we talk about the stuff we talked about earlier today? Is that a yes?

Reyes, who had not previously spoken, answered, "Yeah."

Under questioning from Brandt, Reyes repeated his confession. At the end of the interview, Reyes said, "Let me call my mom." Medici then handcuffed Reyes before taking him to McDonald's to get something to eat.

The total elapsed time, from when Brandt picked up Reyes at his mother's house on February 10 until the conclusion of the interview at the Riverside police station on the same day, was somewhere between five and six hours. Brandt testified at Reyes's preliminary hearing that he picked up Reyes at approximately 9:00 am to drive him to the San Bernardino sheriff's station. He estimated that Reyes then spent about three hours at that station, including both his polygraph test with Heard and his post-polygraph interview with Brandt and Medici. During the suppression hearing, the state represented that Reyes spent four hours at the San

Bernardino sheriff's station.  Brandt then drove Reyes to the Riverside police station for the second interview with Brandt and Medici.  Brandt estimated that the second interview took between forty minutes and an hour.  There is nothing in the record to indicate that Reyes had anything to eat until Medici took him to McDonald's for a late lunch at the conclusion of the interview at the Riverside police station.

## II.  Prior Judicial Proceedings

Reyes and his cousin Andres Munoz were charged in California Superior Court with first-degree murder.  They were tried before the same judge with separate juries.  Reyes moved to suppress his confession as having been obtained in violation of *Miranda*.  The judge concluded that Reyes's February 10 post-polygraph confession at the San Bernardino sheriff's station was voluntary but that he had been in custody within the meaning of *Miranda* when he made the statement. The judge therefore suppressed his unwarned post-polygraph statement at the sheriff's station.  However, the judge refused to suppress Reyes's postwarning confession at the Riverside police station.

At trial, there was inconsistent evidence about the identity of the shooter.  Except for Reyes's postwarning confession, the evidence largely pointed to Reyes's cousin, Munoz, who had been the driver of the car, rather than Reyes, who had been a passenger.

A friend of both Ochoa and Reyes testified that Reyes had been in the back seat, on the passenger side, of a silver car on the afternoon of the shooting.  An eyewitness to the shooting testified that she saw the driver of a silver Camry get out of the car and shoot Ochoa.  She made an in-court identification

of the driver as Munoz. Another eyewitness agreed with this account. She testified that the driver got out of the car, walked toward Ochoa, shot Ochoa, and "continue[d] shooting until he couldn't anymore." She testified that the back door on the driver's side was opened, but that no one got out of the back seat. She was unable to identify the shooter, either when shown photographs shortly after the shooting, or in the courtroom.

Another witness testified that he heard gunshots as he was pulling out of his father's driveway. He pulled back into the driveway and got out of the car to look. He testified that he saw someone get out of the back seat on the passenger side and come around to the driver's side. "I don't know if he actually went to check on the kid [who had been shot] or . . . what else happened. . . . [I]t just happened so quick." He estimated that the time between the shots being fired and the person getting out of the back passenger seat "wasn't long"—"[m]aybe a couple of seconds." Yet another witness, a friend of Ochoa's, testified that he was on the front porch of a friend's house when he heard shots. His view was obscured by cacti, so he "started walking toward the front yard." "We were going towards [Ochoa], and that's when we saw the guy shooting at him. But I only saw when he just went inside the car, like turned around inside the car and yelled out 'Delhi.'" He testified that there were five people in the car and that it was "light brown." He testified that he saw only one person get into the car, and that this person got into the back seat on the driver's side.

The jury returned a verdict finding Reyes guilty of first-degree murder with gang and firearm enhancements. The judge sentenced Reyes to fifty years to life in prison, twenty-five years for the murder conviction and twenty-five years for

the firearm enhancement.  The court stayed sentencing on the two gang enhancements.

Reyes appealed, claiming, *inter alia*, that the trial court had erred in admitting his February 10 confession at the Riverside police station, after he had received *Miranda* warnings.  In his brief to the California Court of Appeal, Reyes made an argument based on *Seibert*.  The Court of Appeal affirmed Reyes's conviction, holding that his confession at the Riverside police station was admissible.

In the view of the Court of Appeal, the "operative question" was whether Reyes's post-polygraph statement had been voluntary.  The Court of Appeal wrote:

> The issue on appeal is whether the trial court erred in allowing defendant's subsequent statements made at the Riverside police station after defendant was advised of his *Miranda* rights.  The *operative question* is thus whether defendant was subjected to coercion within the meaning of the Fifth and Fourteenth Amendments when he was interrogated at the sheriff's station and, if so, whether his statements made thereafter at the Riverside police station were the tainted product of the earlier statements.
>
> . . .

We thus will consider whether the trial court erred in finding that defendant's statements were voluntary.

(Emphasis added.)

The Court of Appeal then spent nine pages analyzing in detail what had taken place during the post-polygraph interview at the police station, concluding that the "trial court had properly ruled defendant's statements, both at the sheriff's station and thereafter at the Riverside police station, were voluntary beyond a reasonable doubt." In the view of the Court of Appeal, because Reyes's statements at the sheriff's station had been voluntary, his later statements at the police station were necessarily "likewise volitional." The Court of Appeal dismissed Reyes's argument under *Seibert* in a single paragraph, on the ground that his statement at the Riverside police station had been "volitional":

Since defendant's statements made at the sheriff's station were voluntary, his waiver of *Miranda* rights at the Riverside police station and statements made thereafter were likewise volitional. Unlike in *Missouri v. Seibert* (2004) 542 U.S. 600, 61[7], the circumstances in the instant case need not "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk." (*Id.* at p. 61[7].)

(Second alteration in original.)

Reyes filed a state habeas petition contemporaneously with his direct appeal.  The Court of Appeal declined to consolidate the petition and the appeal, summarily denying the petition in a one-sentence order.  The California Supreme Court summarily denied both Reyes's direct appeal and his habeas petition.

Reyes timely filed a petition for federal habeas corpus under 28 U.S.C. § 2254.  In his Report and Recommendation, the magistrate judge devoted most of his analysis to whether Reyes's Riverside police station confession was coerced.  He concluded under the deferential standard of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") that the Court of Appeal had not been unreasonable in concluding that the confession was not coerced.  He dismissed Reyes's *Seibert* argument in a footnote, concluding that there was no evidence that the law enforcement officers deliberately employed the two-step method of interrogation condemned in that case.  The district court adopted without comment or correction the conclusions and recommendations of the magistrate judge.

Reyes timely appealed.  Prior to oral argument, we asked the parties to provide supplemental briefs on *Seibert* and its application to the facts of this case.

### III. Standard of Review

We review de novo the district court's decision to deny Reyes's habeas petition. *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996).

Under AEDPA, we may not grant an application for a writ of habeas corpus for a state prisoner with respect to any claim

adjudicated on the merits in state court unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "[C]learly established Federal law" includes only governing legal principles established by the United States Supreme Court at the time the state decision was rendered. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).

A state court's decision is "contrary to" or is an "unreasonable application" of clearly established federal law if it applies a rule that contradicts governing Supreme Court precedent, "unreasonably extends a legal principle . . . to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 405–07 (2000).

"A state-court decision will certainly be contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 405; *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) ("Avoiding [a 'contrary to' error] does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."); *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) ("[M]istakes in reasoning or in predicate decisions of the type in question here—use of the wrong legal rule or framework—do constitute error under the 'contrary to' prong of § 2254(d)(1)."). If a state court's

decision is "contrary to clearly established Federal law, as determined by the Supreme Court," § 2254(d)(1), a federal habeas court does not owe deference under AEDPA to that decision. *Frantz*, 533 F.3d at 739; *cf. Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (stating this rule for "unreasonable application" error). If a "contrary to" error is identified, then "we must decide the habeas petition by considering *de novo* the constitutional issues raised." *Frantz*, 533 F.3d at 735.

We may also grant a writ of habeas corpus in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We "may not second-guess a state court's fact-finding process unless, after review of the state-court record, [we] determine[] that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). To grant relief under this prong, "we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000.

The relevant state court decision for purposes of AEDPA review is the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc). Here, that decision is the California Court of Appeal's decision on direct review of Reyes's conviction. *See Nunnemaker*, 501 U.S. at 805–06.

## IV. Discussion

Reyes makes two arguments. First, he argues that his warned Riverside police station confession on February 10

was coerced in violation of the Fifth Amendment. Second, he argues that this confession was admitted in violation of *Seibert*. For the reasons that follow, we agree with Reyes's second argument. We therefore do not need to reach his first argument.

## A.  "Contrary To"

As the Supreme Court explained in *Oregon v. Elstad*, 470 U.S. 298, 304 (1985), "[p]rior to *Miranda*, the admissibility of an accused's in-custody statements was judged solely by whether they were 'voluntary' within the meaning of the Due Process Clause." That is, the pre-*Miranda* exclusionary rule analysis was simply a Due Process Clause voluntariness inquiry. *Miranda* fundamentally altered the analysis: "The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forego those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984). The Court was concerned in *Miranda* that its "'traditional totality-of-the-circumstances' test posed an 'unacceptably great' risk that involuntary custodial confessions would escape detection." *Seibert*, 542 U.S. at 608 (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)). The Court therefore held in *Miranda* that finding a statement had been "voluntary" would no longer be sufficient. The Court explained, "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements *that are otherwise voluntary* within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Elstad*, 470 U.S. at 307 (emphasis added). *Miranda* and later

cases thus clearly establish that voluntariness, while relevant to the admissibility of a statement given during a custodial interrogation, is not by itself sufficient to establish the statement's admissibility.

*Miranda* was decided in 1966. By the time the Court decided *Seibert* in 2004, "*Miranda* warnings" had taken on near-talismanic significance, almost guaranteeing admissibility of a warned statement. Justice Souter wrote in *Seibert* that "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Seibert*, 542 U.S. at 608–09 (Souter, J., plurality opinion). In *Elstad*, the Court had held that an unwarned voluntary confession followed by a voluntary warned confession did not require the exclusion of the second, warned confession. But in *Seibert*, the Court limited its holding in *Elstad*. In some circumstances, the Court wrote in *Seibert*, "the technique of interrogating in successive, unwarned and warned phases," was a "new challenge to *Miranda*" that *Elstad* had not resolved. *Id.* at 609.

In *Seibert*, a police officer in Rolla, Missouri, conducted an unwarned interrogation of Seibert that was "systematic, exhaustive, and managed with psychological skill." *Id.* at 616. The unwarned interrogation produced a confession. The officer then gave Seibert a twenty-minute coffee and cigarette break. After the break, he read Seibert her *Miranda* warnings, and she signed a written waiver. The officer then resumed questioning, reminding Seibert of her prior prewarning statements. *Id.* at 605. The officer later "testified

that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06.  The *Seibert* plurality wrote, with some understatement, that the use of this two-step interrogation technique "[wa]s not confined to Rolla, Missouri." *Id.* at 609.  Indeed, as the plurality noted, its use had been promoted and endorsed by national police training organizations including the Police Law Institute.  *Id.* at 609–10.

Justice Souter observed in his plurality opinion in *Seibert* that the purpose of the two-step interrogation technique was "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611.  He concluded:

> It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before.  These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.* at 616–17.  In a footnote appended to this passage, Justice Souter made clear that if a two-step interrogation technique violated *Miranda*, the voluntariness of the postwarning statement is irrelevant.  In that circumstance, even a voluntary

statement must be suppressed.    Justice Souter wrote, "Because we find that the warnings were inadequate, there is no need to assess the actual voluntariness of the statement." *Id.* at 617 n.8.

Concurring, Justice Kennedy agreed with Justice Souter that, if deliberately employed, a two-part interrogation technique presented "different considerations" from earlier *Miranda* cases.  *Id.* at 620 (Kennedy, J., concurring in the judgment). While Justice Kennedy's fifth-vote concurrence narrowed *Seibert*'s holding to "those cases involving *deliberate* use of the two-step procedure to weaken *Miranda*'s protections," *United States v. Williams*, 435 F.3d 1156, 1157–58 (9th Cir. 2006) (emphasis added), the plurality and Justice Kennedy agreed that even a voluntary postwarning confession must be excluded where law enforcement officials deliberately withheld *Miranda* warnings until after obtaining an in-custody confession, and where insufficient curative measures had been taken to ensure that the suspect understood the meaning and importance of the previously withheld warnings.

Justice Kennedy wrote:

> The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case.  . . .  I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a

calculated way to undermine the *Miranda* warning.

The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Id.* at 621–22 (Kennedy, J., concurring in the judgment) (internal citations omitted).

The Court has instructed us to take as "clearly established" for purposes of § 2254 the "narrowest" opinion in a fractured majority, as defined under *Marks v. United*

*States*, 430 U.S. 188, 193 (1977). *See Panetti*, 551 U.S. at 949. In accordance with this instruction, we have held that Justice Kennedy's concurrence "represents *Seibert*'s holding." *Williams*, 435 F.3d at 1158; *accord United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010) (collecting cases). While Supreme Court precedent is the only definitive source of "clearly established" federal law, we may consider circuit precedent for the limited purpose of assessing what constitutes "clearly established" Supreme Court law. *Woods v. Sinclair*, 764 F.3d 1109, 1121 (9th Cir. 2014).

Justice Kennedy's concurrence thus constitutes "clearly established" law for the purpose of AEDPA review. Under Justice Kennedy's concurrence, a postwarning statement must be suppressed if interrogating officers deliberately use the two-step interrogation technique that was used in *Seibert*, and if effective curative measures are not taken to ensure that the suspect genuinely understood the *Miranda* warnings. In the words of Justice Kennedy, quoted above, "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

The California Court of Appeal did not understand *Seibert*. In the view of the Court of Appeal, the "operative question" under *Miranda* was whether Reyes's unwarned post-polygraph statement at the San Bernardino sheriff's station had been voluntary. In the view of the Court of Appeal, if that statement had been voluntary, his later Mirandized statement at the San Bernardino police station was necessarily "likewise volitional." The Court of Appeal spent nine pages addressing the voluntariness of Reyes's

unwarned post-polygraph statement at the San Bernardino sheriff's station. For the Court of Appeal, the voluntariness of that statement determined the admissibility of the subsequent warned statement at the Riverside police station. The Court of Appeal addressed *Seibert* in a single paragraph.

We quoted that paragraph above, but we reproduce it here, in its entirety, for the convenience of the reader:

> Since defendant's statements made at the sheriff's station were voluntary, his waiver of *Miranda* rights at the Riverside police station and statements made thereafter were likewise volitional. Unlike in *Missouri v. Seibert* (2004) 542 U.S. 600, 616, the circumstances in the instant case need not "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk." (*Id.* at p. 616.)

(Alteration in original.) The first sentence of the paragraph recites the Court of Appeal's conclusion that Reyes's postwarning statement was "volitional." The second sentence states that, unlike in *Seibert*, Reyes "retained a choice about continuing to talk." That is, in the Court of Appeal's view, because Reyes "retained a choice," his "continuing to talk" was voluntary.

The clearly established rule under *Seibert* is that if officers deliberately employ the two-step technique employed in *Seibert*, and if insufficient curative measures are taken to

ensure that later *Miranda* warnings are genuinely understood, any warned statement thereby obtained must be suppressed, even if the statement is voluntary. Contrary to *Seibert*, the Court of Appeal did not address the question whether the officers deliberately employed the two-step technique. Also contrary to *Seibert*, the Court of Appeal did not address the adequacy, or even existence, of any "curative measures." Instead, the Court of Appeal analyzed at length Reyes's post-polygraph statement at the San Bernardino sheriff's station and concluded that because it was voluntary his subsequent warned statement at the Riverside police station was also voluntary.

Under the circumstances of this case—where police interrogated fifteen-year-old Reyes over the course of two days; where on the first day at the Riverside police station they conducted a two-hour unwarned interrogation; where on the second day at the San Bernardino sheriff's station they obtained a confession during an unwarned interrogation following an unwarned polygraph test; and where they transported Reyes back to the Riverside police station and obtained a postwarning confession "clarifying" what he had stated at the sheriff's station—a *Seibert* analysis was clearly required.

Contrary to *Seibert*, the Court of Appeal did not conduct such an analysis. Instead, the Court of Appeal examined only whether Reyes's statement in his post-polygraph interrogation was voluntary. It wrote, as a prelude to its analysis, that the "operative question" was voluntariness: "We thus will consider whether the trial court erred in finding that defendant's statements were voluntary." Upon determining that Reyes's unwarned statements were voluntary, the Court of Appeal concluded that Reyes's later warned statement at

the Riverside police station was necessarily "likewise volitional." The Court of Appeal then affirmed the trial court's decision not to suppress Reyes's postwarning statement. The Court of Appeal thus addressed, and treated as dispositive, the question whether Reyes's postwarning statement was voluntary, which is precisely the question that is irrelevant under *Seibert*.

We therefore conclude that the Court of Appeal's decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). Because its decision was "contrary to" *Seibert*, we owe it no deference.

On habeas review, the federal magistrate judge recommended denying relief, rejecting in a footnote Reyes's argument under *Seibert*. The magistrate judge correctly understood the rule in *Seibert* but concluded without analysis of the evidence that the law enforcement officers in this case had not deliberately employed the two-step interrogation process. Deliberateness is a factual finding that we review for clear error. *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007); *McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003) (applying clear error review to findings of fact made by a district court on AEDPA review). Clear error review requires us to form a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted). A more searching review is appropriate where the trial court's decision was based on documents, as it was here, rather than credibility evaluations. *See id.* at 243 ("[T]he key evidence consisted primarily of documents and expert testimony. Credibility determinations played a minor role. Accordingly, we find that an extensive review of the

District Court's findings, for clear error, is warranted."); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500–01 (1984) ("The same 'clearly erroneous' standard applies to findings based on documentary evidence as to those based entirely on oral testimony, but the presumption has lesser force in the former situation than in the latter." (internal citation omitted)).

We conclude that the magistrate judge, and the district court in entering judgment based on the recommendation of the magistrate judge, clearly erred. We wrote in *Williams* that evidence of deliberateness in a *Seibert* inquiry can be either objective or subjective. "[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." 435 F.3d at 1158. The absence of direct evidence of subjective intent is not dispositive. *Capers*, 627 F.3d at 479. As we have recognized, "the most plausible reason" for delaying *Miranda* warnings until after a suspect has confessed "is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness," and "'the intent of the officer will rarely be as candidly admitted as it was [in *Seibert*].'" *Williams*, 435 F.3d at 1158–59 (quoting *Seibert*, 542 U.S. at 617 n.6 (Souter, J., plurality opinion)) (emphasis in original).

In *Williams*, we provided a nonexhaustive list of probative objective evidence. Such evidence includes "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Id.* at 1159; *see also United States v. Barnes*, 713 F.3d 1200,

1205 (9th Cir. 2013) (per curiam) (examining the record for objective evidence under *Seibert*); *Capers*, 627 F.3d at 479 ("[W]e join our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence."); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007) (examining the totality of the circumstances to infer deliberateness); *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) (holding that the deliberateness determination requires an evaluation of "the totality of the circumstances, including 'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements'" (quoting *Williams*, 435 F.3d at 1159)); *United States v. Briones*, 390 F.3d 610, 614 (8th Cir. 2004).

Based on the objective evidence in this case, we conclude that Brandt and his fellow officers deliberately employed the two-step interrogation technique condemned in *Seibert*, and that the magistrate judge and the district court clearly erred in concluding otherwise. Reyes first confessed in the unwarned interrogation conducted by Brandt and Medici at the San Bernardino sheriff's station on February 10, after Heard told Reyes that he had failed the polygraph test. That unwarned interrogation, as well as the unwarned interrogation the previous day at the Riverside police station, were, like the interrogation in *Seibert*, "systematic, exhaustive, and managed with psychological skill." *Seibert*, 542 U.S. at 616.

In the unwarned interrogation at the San Bernardino sheriff's station, Brandt and Medici obtained statements from

Reyes admitting that he shot Ochoa and establishing the outline of the events that occurred that afternoon; information about how Reyes obtained the gun used in the shooting and what happened to it afterward; and details about the shooting. In the warned interrogation that followed, Reyes provided essentially the same information.

The three Riverside police officers involved in the case—Brandt, Wheeler and Medici—were all experienced officers. *Cf. Capers*, 627 F.3d at 481 ("Inexperience, while not a legitimate excuse for postponing a *Miranda* warning, nevertheless may save a confession from exclusion under *Seibert*."). All three were homicide detectives. At the time of the interrogations, Brandt had been a police officer in California for twelve years and a homicide detective for the last four. The tenure of Wheeler and Medici is not specified in the record, but we may infer from their ranks that they both had substantial experience.

Brandt did not take "curative measures" to ensure that Reyes understood "the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Indeed, he did quite the opposite. Brandt was the lead investigator. He was involved in the case from beginning to end. Brandt asked Reyes to accompany him to the Riverside police station on the morning of February 9 after the SWAT team had entered his aunt's house and placed him in handcuffs. Brandt and Wheeler questioned Reyes at the police station for about two hours that day. During that interview, Brandt asked Reyes if he would be willing to take a polygraph examination. Brandt picked Reyes up at his mother's house the next morning and took him to the San Bernardino sheriff's station for the examination. After Heard told Reyes

that he had failed the polygraph examination, Brandt and Medici came into the room and took over from Heard. During the unwarned interview at the sheriff's station on February 10, Brandt and Medici obtained a detailed confession from Reyes. After obtaining the confession, Brandt drove Reyes directly to the Riverside police station, where he and Wheeler had questioned him the day before. On arrival at the Riverside station, Brandt and Medici questioned Reyes again. At the beginning of this interview, Brandt finally provided *Miranda* warnings. During this interview, Reyes gave to Brandt and Medici the same detailed confessions he had just given.

Brandt and Medici had obtained the incriminating information from Reyes very early in the unwarned interview at the sheriff's station, on the seventh page of the transcript. Yet they continued questioning and talking to Reyes for another thirty-five pages. They did so in a nonconfrontational, sympathetic way, with the result that Reyes was made to feel sufficiently comfortable that he talked about his family's Christmas rituals and laughed when Brandt said he could not stay up late enough to open presents. At the end of the interview, Reyes even asked Brandt and Medici not to tell his mother what he had confessed to them: "It'll be cool like if you guys don't tell my Mom."

At the beginning of the follow-on interview at the Riverside police station, Brandt gave Reyes the *Miranda* warnings, as recounted above. But, as is evident from the transcript, he played down their importance. He said he wanted "just to clarify stuff," suggesting by his use of the word "clarify" that the "stuff" had already been conveyed in the earlier interview, and that the only purpose of the later interview was clarification. Brandt then said he wanted to

"read you your rights" because "you've been sitting in that room and the door was locked and you're not free to leave." To a reasonable person not trained in the law, let alone a fifteen-year-old high school freshman, these stated reasons were hardly an effective means of conveying the fact that the warning he was about to give could mean the difference between serving life in prison and going home that night.

After Brandt read the *Miranda* warnings, he said, "Do you understand each of these rights that I've explained to you? Yeah? OK. Can we talk about the stuff we talked about earlier today? Is that a yes?" While giving the *Miranda* warnings, Brandt did not pause to ask "Is that a yes?" after asking if Reyes understood "each of the rights" listed. Only after the *Miranda* warnings had been completed and after Brandt asked whether "we [can] talk about the stuff we talked about earlier today" did Brandt finally ask "Is that a yes?" and wait for a response. In contrast to the interrogation in *Seibert*, Brandt did not ask Reyes for a signed waiver of rights or a signed acknowledgment of having read and understood the *Miranda* warnings.

The psychological, spatial, and temporal break between the unwarned and warned interrogations was not enough to cure the violation. Perhaps most important, Brandt had been a continuous presence throughout. He and Wheeler were the two questioners in the unwarned interrogation on February 9; he was the primary questioner in both the unwarned and warned interrogations on February 10; and he had personally driven Reyes on February 9 and 10, including the short trip between the sheriff's station and the police station on February 10. Further, although the unwarned February 10 interrogation took place at the San Bernardino sheriff's station and the warned interrogation took place at the

Riverside police station, the warned interrogation was conducted in a familiar place where Reyes had been questioned by Brandt the previous day. The record does not tell us the driving distance and time between the sheriff's station and the Riverside police station, but a map of the area indicates that it was no more than fifteen miles. The timeline for the events on February 10, described above, indicated that the driving time was not likely to have been more than about thirty minutes. This case is quite unlike *Bobby v. Dixon*, 132 S. Ct. 26, 32 (2011) (per curiam), in which there was a four-hour gap, during which the defendant was transported from the police station to a separate jail and back, and during which the defendant spoke with his lawyer and learned material facts about the ongoing investigation. *See also Capers*, 627 F.3d at 484 (holding that a ninety-minute break in time between interrogations was not curative in part because police personnel were consistent and "both [interrogations] occurred while Capers remained in handcuffs and in settings that clearly established the authoritative nature of the questioning").

## B.  "Unreasonable Determination of the Facts"

Our concurring colleague reads the Court of Appeal's decision as understanding and applying *Seibert*. In his view, the Court of Appeal's quotation from Justice Souter's plurality opinion (in the paragraph we quoted above) shows that it understood *Seibert*, and that the Court of Appeal viewed the question before it to be whether Brandt and his fellow officers took sufficient curative measures to ensure that the *Miranda* warnings given at the Riverside police station were effective. Thus, in the view of our concurring colleague, the Court of Appeal's decision was not "contrary to" *Seibert*. But our colleague nonetheless agrees with the

result we reach in this case. In his view, even under AEDPA's deferential standard, we must grant habeas relief because the Court of Appeal's conclusion that sufficient curative measures were taken is an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *See* Concurrence at 44–45.

For the reason given above, we disagree with our concurring colleague on the question whether the Court of Appeal's decision was "contrary to" *Seibert*. However, we note that, although we do not need to reach the question whether the Court of Appeal's decision rests on an "unreasonable determination of the facts," we entirely agree with him on that question. It is readily apparent, on the factual record of this case, that Brandt and his fellow officers did not take "curative measures" that would "ensure that a reasonable person in [Reyes's] situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." 542 U.S. at 622 (Kennedy, J., concurring). Indeed, as described above, far from taking "curative measures," they took affirmative steps to ensure that Reyes did *not* "understand the import and effect" of the *Miranda* warning he was finally given at the Riverside police station.

## Conclusion

The California Court of Appeal applied a rule that was contrary to federal law as clearly established by the Supreme Court in *Seibert* when it concluded that Reyes's postwarning confession was admissible solely on the ground that it was voluntary. We hold that police officers deliberately employed a two-step interrogation technique, and that they did not take appropriate "curative measures," in violation of

*Seibert*. We therefore hold that Reyes's postwarning confession should have been suppressed. Because the state did not argue harmless error in this court or the district court, that defense is waived. *See United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001). Accordingly, we reverse the district court's denial of Reyes's petition for a writ of habeas corpus and remand with instructions to grant the writ unless Reyes is retried within a reasonable time, not to exceed 180 days.

**REVERSED and REMANDED.**

SINGLETON, Senior District Judge, concurring:

The majority has joined in a thoughtful and thorough judgment in this case. I concur in that judgment. The majority has forcefully marshaled the facts and analyzed the applicable law. If this case had arisen entirely within the federal system, *e.g.*, under 28 U.S.C. § 2255, I would fully join in the opinion and have no further comments or suggestions.

This case does not arise entirely within the federal system, however, but comes to us from state court under § 2254, and thus our review must be guided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires us to give deference to decisions of the state courts both as to the facts and the law, except in limited circumstances.

The majority identifies *Missouri v. Seibert*, 542 U.S. 600 (2004), as clearly established federal law at the time the

California Court of Appeal decided this case and looks to Justice Kennedy's concurring opinion to provide the appropriate rule of decision. I agree. *See United States v. Williams*, 435 F.3d 1148, 1157–59 (9th Cir. 2006) (analyzing *Seibert* and concluding that Justice Kennedy's opinion is the narrowest holding obtaining five votes). In the majority's view, the California Court of Appeal recognized *Seibert* as controlling but unreasonably interpreted it, effectively ignoring *Seibert* and deciding the case under the prior law set out in *Oregon v. Elstad*, 470 U.S. 298 (1985). The majority concludes that, since the California court failed to apply clearly established law, we may withhold any deference and exercise our independent judgment in reviewing the California Court of Appeal's decision de novo.

I disagree. My review of the record leads me to conclude that the California Court of Appeal's conclusions of law are in conformity with *Seibert* and Justice Kennedy's concurrence. In my view, the state court's approach to the law is sound, but its finding of facts are unreasonable in context. I therefore, on this alternate ground, join in this Court's judgment. My reasons are as follows.

In reaching a contrary view, the majority focuses exclusively on one part of Justice Kennedy's concurrence. *Seibert* addresses what we have termed a two-step interrogation leading to a confession. The first part of the interrogation is unwarned. Once the suspect confesses, *Miranda* warnings are given, and the interrogation resumes. Typically, the suspect confirms his confession. In practice, the earlier confession is suppressed, but following *Elstad*, the subsequent post-warning statement is allowed into evidence if it is voluntary. *Seibert* modified *Elstad* in cases such as this. The opinion was fragmented. Justice Souter wrote an

opinion for a plurality of four justices.  Justice Kennedy separately concurred, arguably on a more limited basis, and Justice O'Connor wrote a dissent in which three other justices joined.  The majority and I agree that Justice Kennedy's opinion provides the holding of *Seibert.*  We disagree on how *Seibert* should be applied to this case.

In my view, Justice Kennedy adopts all of Justice Souter's plurality opinion but imposes a limitation.    Rightly understood, Justice Kennedy's opinion adopts a two-part test for determining the validity of a confession where the police use a two-step approach in their interrogation of a suspect. The first prong, which I will call the Kennedy prong, asks whether the two-step procedure was chosen intentionally in order to render subsequent *Miranda* warnings ineffective. The second prong, which I will call the Souter prong, asks if the two-step process, whether or not intentional, rendered the subsequent warnings ineffective.  For Justice Kennedy, both prongs must be satisfied in order to create a *Siebert* violation and take the case out of *Oregon v. Elstad.*  Since the test has two prongs, it is analogous to the *Strickland* test for determining ineffective assistance of counsel.[1]  Like that test, a reviewing court should be able to look to either prong first, and, if that prong is not satisfied, there is no need to address the other prong. *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009).  Viewed in this light, the California Court of Appeal's decision is within the law.  That court quoted Justice Souter directly for the second prong of the test and concluded that nothing in the record of the interrogation "challenged the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

would not have understood them to convey a message that [he] retained a choice about continuing to talk."

Justice Kennedy's test requires that any two-step procedure must be intentionally motivated to undermine *Miranda*. Justice Souter rejects reference to the police intent and focuses only on whether the process itself challenged the comprehensibility and effectiveness of the *Miranda* warnings. Thus, if as the California Court of Appeal found, Reyes understood at the time of the second stage of the interview that he retained a choice about whether to talk, his decision to talk was consistent with *Seibert*, and there was no need for the Court of Appeal to address the first prong of the test and determine whether the police intended to nullify the *Miranda* warnings.

The Court of Appeal did not separately address the first prong of the test, and so by analogy to *Strickland*, we may review that prong de novo and exercise independent judgment.[2] *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Mann v. Ryan*, 774 F.3d 1203, 1215 (9th Cir. 2014) ("Because the state post-conviction court did not reach the deficiency prong of the *Strickland* analysis, our review of this prong is not circumscribed by AEDPA."). I agree with the majority that, under the facts of this case, the use of the two-step procedure was a conscious effort to undermine *Miranda*.

---

[2] It is clear that the Court of Appeal did not think that the procedure followed undermined the effectiveness of the mid-stream *Miranda* warnings. It is not clear that the Court of Appeal considered whether the procedure was chosen to undermine *Miranda*. Even if I were to assume that the Court of Appeal found no intent, sub silentio, requiring deference I would still conclude under *Williams* that the procedure was chosen intentionally. *See Williams*, 435 F.3d at 1160 (discussing how to prove a deliberate choice of procedure).

*See Williams*, 435 F.3d at 1158–60 (discussing how a court should determine whether an interrogation was deliberately used to undermine *Miranda*).

The second prong of the test was addressed by the Court of Appeal, and we must grant deference and may only reject the finding if it was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254 (d)(2).

The majority points out that the Court of Appeal did not explain its factual finding that the mid-stream *Miranda* warning was not undermined by the interrogation procedure chosen by the police. In such a case, we must look to all of the relevant evidence to determine if the fact finding is reasonably supported. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."). Reyes has a heavy burden to establish that a state court fact finding is unreasonable. *See Burt v. Titlow*, __ U.S. __, 134 S. Ct. 10, 15–16 (2013). I am satisfied that he has sustained that burden here.

The majority has summarized all of the relevant evidence, and it need not be repeated here. Guided by *Williams* regarding a determination of the effectiveness of mid-stream *Miranda* warnings, *see Williams*, 435 F.3d at 1160–62, I do not believe that there is substantial evidence that would support an inference that the warnings given to Reyes were effective at the time they were given. There is no evidence of the corrective measures identified by Justice Kennedy.

Turning to the factors considered relevant by the plurality: 1) the pre-warning interrogation was complete and detailed, consuming many hours; 2) the two rounds of interrogation overlapped; 3) the two rounds of interrogation were close in time; 4) there was a continuity of police personnel; and, most importantly, 5) the interrogator's questions treated the second round of interrogation as continuous with the first.

Viewed in light of the totality of the circumstances, there is no evidence that would permit a finding that the two-step interrogation in this case did not undermine *Miranda* and lead to an involuntary confession.